Samuel J. Silverman, J.
This is a motion to dismiss the complaint at the close of the plaintiff’s case in the trial of an action for libel.
Plaintiff, Dr. Linus C. Pauling, is a world famous scientist, winner of a Nobel Prize for chemistry and of a Nobel Peace Prize. Defendants are the corporate owner, and the individual publisher and editor of a fortnightly magazine called National Review.
There are two causes of action based on two ariicles, one in the National Review of July 17, 1962 and one in the issue of September 25, 1962.
*976 The first article says, among other things:
“ The Collaborators
“ What are we going to do about those of our fellow citizens who persist in a course of collaboration with the enemy who has sworn to bury us?
* * *
11 Take, second, Professor Linus Pauling of the California Institute of Technology, once more acting as megaphone for Soviet policy by touting the World Peace Conference that the Communists have called for this summer in Moscow, just as year after year since time immemorial he has given his name, energy, voice and pen to one after another Soviet-serving enterprise. Or * # * Or * * * who a couple of months ago, along with Linus Pauling and a dozen others, attached their signatures to one more in a decades-long series of Communist-aiding fronts : this time, an Open Letter not only calling for the liquidation of South Vietnam’s President Ngo Dinh Diem but condemning the presence of American personnel in that country as imperialist aggression (hence, by implication, more than justifying the Vietcong for killing Americans).
‘ ‘ Are such persons Communists? Some such undoubtedly are, but there is not publicly at hand the full proof, of the kind demanded by the courts, that they are Communists in the total, deliberate, disciplined organizational sense. But whether they are Communists or not in the legal sense, the objective fact is that these persons we have named, and many others like them, have given aid and comfort to the enemies of this country. They have done so not once or twice, by Avhat might have been a special impulse, quirk or personal attachment, but time and again, over a period of years and decades; and some of these acts are saved from falling under the constitutional definition of treason only by the historical chance that our government has not yet decided to give direct legal recognition to the fact that our present enemies are our enemies, and that we are at war.
“ So we repeat: what are Ave going to do about these people? If it is proper that for the time being they should be immune from legal sanction, does it also follow that they should continue to receive public respect, honor and reAvards ?
* *
“ This soft and complacent public attitude toAvard the collaborators amounts, at bottom, to a general collusion in the sabotage of the nation’s will, and in the moral nihilism that their actions express. If our standards have so far dissolved that there is no *977 longer anyone on whom, we will turn our hacks, then we as a people are ready for suicide.”
The second article sued on reads, in part, as follows:

“Are You Being Sued

By Linus Pauling?

“ We are (or so his lawyer tells us). And so are other well-behaved papers and people throughout the country.
% # *
“Dr. Pauling is chasing after all kinds of people, even the formidable Sam Newhouse, owner of twenty-odd daily newspapers. His victory signal is the check or two he has wrested from publishers — who may indeed have libeled him, in which case they should pay up; but who may simply have been too pusillanimous to fight back against what some will view as brazen attempts at intimidation of the free press by one of the nation’s leading fellow-travelers. ’ ’
Approximately a year and a half after this suit was instituted, the United States Supreme Court in New York Times Co. v. Sullivan (376 U. S. 254 [1964]) enunciated a new doctrine in the law of libel, as affected by the First Amendment. And the critical question on the present motion is whether that doctrine should be extended to apply to the present case, and, if so, whether plaintiff has proved a prima facie case under that doctrine.
In New York Times Co. v. Sullivan (supra, pp. 279-280) the Supreme Court held that: “ The constitutional guarantees [of the First and Fourteenth Amendments] require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with ‘ actual malice ’ — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.”
Plaintiff is not a public official, and so the first question is whether New York Times Co. v. Sullivan has any applicability to his case at all. The Supreme Court has certainly not excluded that possibility. In the New York Times case it said (p. 283, n. 23): “ We have no occasion here to determine how far down into the lower ranks of government employees the ‘ public official ’ designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not he included ” (italics added).
In its last pronouncement on the point, the Supreme Court said: “ We are treating here only the element of public posi *978 tion, since that is all that has been argued and briefed. We intimate no view whatever whether there are other bases for applying the Neio York Times standards — for example, that in a particular case the interests in reputation are relatively insubstantial, because the subject of discussion has thrust himself into the vortex of the discussion of a question of pressing public concern. Cf. Salinger v. Cowles, 195 Iowa 873, 889, 191 N. W. 167, 173-174 (1922); Peck v. Coos Bay Times Publishing Co., 122 Ore. 408, 420-421, 259 P. 307, 311-312 (1927); Coleman v. MacLennan, 78 Kan. 711, 723-724, 98 P. 281, 285-286 (1908); Pauling v. News Syndicate Co., 335 F. 2d 659, 671 (C. A. 2d Cir. 1964).” (Rosenblatt v. Baer, 383 U. S. 75, 86, n. 12.)
The underlying policy adopted by the Supreme Court in the New York Times case would seem to favor extending the doctrine of that case at least to a private person who “ has thrust himself into the vortex of the discussion of a question of pressing public concern ’ ’.
In Rosenblatt v. Baer (supra), Mr. Justice Brennan, speaking for the court, said (pp, 85, 86): “ The motivating force for the decision in New York Times was twofold. We expressed ‘ a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open and that [such debate] may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.’ 376 17. S., at 270. (Emphasis supplied.) There is, first, a strong interest in debate on public issues, and, second, a strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues. * * * Society has a pervasive and strong interest in preventing and redressing' attacks upon reputation. But in cases like the present, there is tension between this interest and the values nurtured by the First and Fourteenth Amendments. The thrust of Neio York Times is that when interests in public discussion are particularly strong-, as they were in that case, the Constitution limits the protections afforded by the law of defamation.”
In determining- the relative importance and protection to be given to the interest in public discussion, on the one hand, and the safeguarding of individual reputation on the other, the Supreme Court, in the New York Times case, has shifted the balance sharply in favor of the freedom of public discussion. Logically, of course, limitations on the law of libel as a protection of public persons may discourage private persons (viewed as possible libel plaintiffs)1 from speaking- out on issues when *979 to do so may expose them to attacks on their own reputation. But, conversely, viewing these speakers as possible defendants in libel suits, such limitations may encourage them to speak out. And the Supreme Court apparently believes that the latter consideration outweighs the former. In New York Times Co. v. Sullivan (376 U. S. 254, 271, supra) the court quoted with approval the following from Cantwell v. Connecticut (310 U. S. 296, 310): “In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or arc, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.”
In Gilberg v. Goffi (21 A D 2d 517, 527-528 [1964], affd. 15 N Y 2d 1023 [1965]) the Appellate Division, Second Department, applying New York Times Co. v. Sullivan, said: “Within the periphery of the new body of case law, we hold, on a balancing of interests, that democratic government is best served when citizens, and especially public officials and those who aspire to public office, may freely speak out on questions of public concern, even if thereby some individual be wrongly calumniated ”.
The Supreme Court, in the New York Times case, quoted (p. 268) Beauharnais v. Illinois (343 U. S. 250, 263) that “ public men, are, as it were, public property ”.
Again, referring to the risk of successive libel judgments against a newspaper, the court said (p. 278): “ Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive.”
These considerations, stated by the court with reference to public officials, would seem to be equally applicable to a private person who publicly, prominently, actively, and as a leader, thrusts himself (however properly) into a public discussion of public and exceedingly controversial questions.
In Gilberg v. Goffi (21 A D 2d 517 [1964], affd. 15 N Y 2d 1023 [1965], supra) the New York State courts applied the New York Times doctrine to a law partner of the Mayor of a city, who sued a rival candidate for Mayor, for libel, when the latter *980 said that the Mayor’s law firm (of which plaintiff was, of course, a partner) was practicing law under conditions which showed a conflict of interest. The court said (p. 520) that, although plaintiff was not a public official, “ plaintiff’s action is so closely related to criticism of a public official that the Times case is determinative ”. Cases in other jurisdictions have applied the New York Times doctrine to private persons who actively engage in a public controversy. (See, e.g., Walker v. Courier-Journal, 246 F. Supp. 231 [W. D. Ky., 1965].)
Finally, the United States Court of Appeals for the Second Circuit has indicated very strongly its view that Dr. Pauling is a person to whom the rule of New York Times v. Sullivan should apply. In Pauling v. News Syndicate Co. (335 F. 2d 659, 671 [C. A. 2d, 1964]) the court said, with reference to the doctrine of the New York Times case: “Although the public official is the strongest case for the constitutional compulsion of such a privilege, it is questionable whether in principle the decision can be so limited. A candidate for public office would seem an inevitable candidate for extension * * *. Once that extension was made, the participant in public debate on an issue of grave public concern would be next in line; thus, as applied to the case in hand, if a newspaper could not be held for printing Dr. Pauling’s charges that a member of the Atomic Energy Commission had 1 made dishonest, untrue and misleading statements to mislead the American people ’ and that a United States Senator is ‘ the greatest enemy * * * the United States has,’ as the New York Times case decided, one may wonder whether there would be sound basis for forcing it to risk a jury’s determination that it was only engaging in fair criticism rather than misstating facts if it printed, falsely but without malice, that in saying all this Dr. Pauling was following the Communist line.”
In the case at bar, Dr. Pauling testified that after he read the Smythe Report on atomic energy, about 1946, he became greatly concerned about the destructive effects on our civilization of a possible nuclear war. He began to accept invitations as a speaker on this subject; he became interested in educating his fellow Americans as to this danger; he further testified that this has been a dominating interest with him for over 20 years and, during that period, he has given some 750 addresses, lectures, talks, etc., with respect to atomic weapons, the need to control them, the need to prevent war, and the need for settling disputes by international law. He has travelled about the world and spoken on these subjects. He has pressed his views on *981 heads of State, ambassadors, and other public officials. Ilis efforts have gained him such prominence in this field that he was awarded the Nobel Peace Prize. By the same token, however, he has from time to time found himself — as was his right as a citizen — in public and active opposition to persons and policies that he deemed inconsistent with his views; and quite frequently his publicly-expressed views on many questions — not merely those relating to his efforts for world peace — have been contrary to those expressed by the more conservative or right-wing elements in this country. On June 8, 1962, he had joined in a call for a World Peace Conference to be held in Moscow that Summer. A few months earlier he had joined in “ An Open Letter to President John F. Kennedy against H. S. military intervention in South Vietnam”, which letter was published as a paid advertisement in the New York Times.
The matters he has disclussed are, of course, matters of the gravest and most widespread public importance; they concern the foreign policy of the United States, the military operations now going on, and the future of civilization itself. And at each step there have been many who disagreed with Dr. Pauling.
It is clear that if any private citizen has, by his conduct, made himself a public figure engaged voluntarily in public discussion of matters of grave public concern and controversy, Dr. Pauling has done so.
Finally, the criticisms made of him in the alleged libelous articles are not criticisms of his private life; they are criticisms of his public conduct and of the motives for that public conduct. This applies even to the intimation in the second article that by his libel suits he is attempting to intimidate the press; for the freedom of public discussion is itself a public issue and one that is properly a subject of public discussion.
Accordingly, I hold that, in order for Dr. Pauling to recover, it would be necessary for him to meet the standards of New York Times Co. v. Sullivan.
The basic principle of New York Times Co. v. Sullivan is that, in the cases to which it applies, there can be no recovery for even a defamatory falsehood unless the plaintiff proves that the statement was made ‘ ‘ with knowledge that it was false or with reckless disregard of whether it was false or not ” (p. 280). This kind of “ actual malice ” “ ‘ is not presumed but is a matter for proof by the plaintiff’” (p. 284; and see p. 279, quoted sivpra).
In the case at bar, there is no real evidence that defendants knew that the statements they made were false. A four-year-old *982 conversation with an editor, who did not himself have anything to do with the writing of the allegedly libelous articles, is no more sufficient to show knowledge of falsity than were the news stories in the Times files in New York Times Co. v. Sullivan. As the court there said (p. 287): “the state of mind required for actual malice would have to be brought home to the persons in the Times’ organization having responsibility for the publication ’ ’ of the alleged libel.
Plaintiff argues that he has shown “ reckless disregard ” by the defendants of whether the article “was false or not”. But all the plaintiff’s evidence on this phase of the case amounts to, giving it the most favorable inferences, is that defendants relied on unreliable sources, and that if they had checked in a reasonable manner, they would have ascertained that their statements were false. Assuming these facts to be true, that is still not a showing of “ reckless disregard of whether it was false or not” in the New York Times Co. v. Sullivan sense. As the Supreme Court pointed out in Garrison v. Louisiana (379 U. S. 64, 79 [1964]): “The reasonable-belief standard * * * is not the same as the reckless-disregard-of-t.ruth standard. * * * The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on more negligence, but on reckless disregard for the truth.” Reckless disregard of whether a statement is false or not, in the Neto York Times sense, is to be contrasted with the “ utterances honestly believed ” (Garrison v. Louisiana, p. 73, supra) which are to be protected. Such reckless disregard must be the equivalent of the “calculated falsehood” (ibid., p. 75), which is not protected.
The evidence presented by plaintiff does not meet this standard.
In this aspect of the case, perhaps the most vulnerable passage in the libelous articles is this: ‘ ‘ Are such persons Communists Í Some such undoubtedly are, but there is not publicly at hand the full proof, of the kind demanded by the courts, that they are Communists in the total, deliberate, disciplined organizational sense.”
Assuming that this could be read as referring to plaintiff, it could be argued that this is a charge that plaintiff is a Communist, with an admission that the writer has no evidence of it; and therefore that the charge is made with reckless disregard of whether it is false or not.
But of course the admission in the article that there is no legal evidence to support the charge — assuming it to apply *983 to plaintiff — itself limits the charge. To hold that this statement is not protected under New York Times Co. v. Sullivan would risk the very dangers that the Supreme Court gave as a ground for rejecting a rule that defendants he required to prove truth (p. 279): “Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which ‘ steer far wider of the unlawful zone.’ * * * The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments. ’ ’
Neither knowledge of falsity nor reckless disregard of whether the statements were false or not has been shown with the ‘ ‘ convincing clarity which the constitutional standard demands ’ ’, and thus a judgment based on such evidence would not be permitted to stand {Neto York Times Co. v. Sullivan, pp. 285-286). And it is for the Judge in the first instance to decide whether that standard has been met (ibid., and cf. Rosenblatt v. Baer, p. 88).
The record of this trial is extremely voluminous. So I should make clear that on the basis of pre-New York Times v. Sullivan law, plaintiff would have proved a prima facie case. The articles on their face are libelous, i.e., defamatory if untrue; the defenses of truth, fair comment without malice, etc., to the extent thus far gone into, all present questions of fact for the jury. Publication of the article by the corporate defendant, with the active participation and approval of the individual defendant editor, is conceded. While the participation by the individual defendant publisher, Mr. Pusher, is perhaps marginal, enough has been shown of his participation to present a question for the jury as to his responsibility. The suggestion that damage has been conclusively disproved by plaintiff’s own reputation witnesses is unfounded; to begin with, that issue was not fully explored with those witnesses and properly so under Linchan v. Nelson (197 N. Y. 482 [1910]); and in any event the testimony of the reputation witnesses was limited to plaintiff’s reputation in the academic and scientific communities and was not conclusive.
But, applying New York Times Co. v. Sullivan, I hold that plaintiff has failed to prove a prima facie case, and the complaint must be dismissed.
Lest there be any misunderstanding, I do not hold that the charges against Dr. Pauling, made in the articles, are true or *984 justified. It is clear that in all his actions Dr. Pauling acted well within his legal rights. And if his conscience required him to take the actions arid pursue the course of conduct that he has pursued for the last 20 years, then he has acted in accordance with his moral duty. Accepting plaintiff’s testimony, presumably his work for public education and world peace has imposed certain sacrifices on Dr. Pauling. Dr. Pauling has added the prestige of his reputation to aid the causes in which he believes. I merely hold that by so doing he also limited his legal remedies for any claimed libel of his reputation. And perhaps this can be deemed another sacrifice that he is making for the things he believes in.
I should finally mention one matter of judicial economy. When plaintiff rested late Friday afternoon, and defendants moved to dismiss the complaint, I reserved decision and indicated that I was going to send the case to the jury ultimately. We were then in the sixth week of trial. (Actually, because of intervening religious holidays, etc., there had been about five weeks of testimony.) If I were to grant the motion to dismiss now, and an appellate court disagreed with me, the appellate court would have no choice but to order a new trial, and the weeks of trial that we have thus far had would have to be done over again. On the other hand, if I reserved decision on the motion to dismiss and let the case go to a jury verdict, then, even if I should thereafter dismiss the complaint, and the appellate court were to disagree with me, the appellate court would not have to order a new trial, but could merely enter the appropriate final judgment. Recognizing that the law in this area is still evolving and that the appellate courts might hold the Netv York Times case inapplicable, I thought it wiser to reserve decision and thus minimize the risk of retrial. But over the weekend I reconsidered this question, and, accordingly, I inquired of counsel as to how much longer the case would take, and I required them, as officers of the court, to make representations to me as to what additional evidence they expected to produce and by what witnesses. Counsel’s estimates as to the future length of the trial varied, but both sides agreed that there are still a number of weeks to go. My own guess is that probably the remainder of the case would take about as long to try as plaintiff’s case has taken thus far. Thus, if I were now not.to grant the motion to dismiss, but were to reserve decision, and the appellate courts should agree with me that the doctrine of New York Times Co. v. Sullivan applies, I would have subjected the parties, the court, and the jurors to about *985 as much additional unnecessary trial as I would if I were to grant the motion to dismiss, now, and the appellate courts disagreed with me. This seems to me too high a premium to pay as insurance against the ever-present risk of error on my part. It is for these reasons that I am not reserving decision. The motion to dismiss the complaint is granted.