Rockford ROWDEN, Plaintiff-Respondent,

v.

James E. AMICK, Defendant-Appellant.

No. 25218.

Kansas City Court of Appeals.

Missouri.

June 2, 1969.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 6, 1969.

Application to Transfer Denied Dec. 8, 1969.

. James E. Amick, pro se.

Roger W. Penner, of Meyer, Smith, Bott & Penner, Kansas City, for plaintiff-respondent.

MAUGHMER, Commissioner.

Action for libel brought by a public official (Deputy City Marshal) against a private citizen. Plaintiff claimed damages resulting from publication of specific statements concerning the performance of his public duties. Trial resulted in a verdict and judgment for plaintiff in the sum of $300.00 actual and $1,000.00 punitive damages. Defendant's motion for new trial was denied and he has appealed.

Both litigants were residents of Lake Tapawingo, Jackson County, Missouri, a town or village of approximately 250 families. The plaintiff, Rockford Rowden, on January 2, 1964, was a Deputy City Marshal. The defendant, James E. Amick, had been a school teacher but at the time in question was an insurance broker. On January 2, 1964, the plaintiff placed a "ticket" on defendant's Ford automobile which set forth that the vehicle was "illegally parked". Thereafter a summons was issued, defendant was brought before the City Police Court Judge, a trial was held and defendant was found guilty. A fine of $5.00 and costs was assessed. De-

fendant did not appeal. He indicated that he might have appealed except that before he did so his wife "paid the fine and costs."

For our purposes it is unnecessary, we think, to describe in detail the evidence adduced at the police court hearing. Mr. Rowden testified that the Ford was parked in the street forty-eight inches from the edge of the black top portion and contrary to applicable city ordinance requirements. The Mayor of Lake Tapawingo, Mr. Chester Andes, supported such testimony, said he had helped in the measurement, and that it was forty-eight inches from the right wheel to the edge of the ditch. The Mayor, though, thought they had measured from the front wheel and the Deputy Marshal, from the back wheel.

Defendant testified that he usually parked his automobile in his driveway but on December 26, 1963, he left the lights on over night and the battery "went dead"; that he got a "quick charge" and pending a complete recharge, parked the vehicle on the street in front of his house and on a hillside so that even though the battery might go dead again he could get a rolling start and not be left stranded. He said he saw the plaintiff on January 2, 1964, look at his vehicle, place a ticket on it, make inquiry of a neighbor, and then come to defendant's door; that plaintiff told him the car would have to be moved and indicated the violation was for parking on a hillside. Defendant refused to move the automobile and the police court trial resulted. Defendant testified that the right rear wheel was only eight inches from the edge of the black top. His neighbor, Mr. George Geiger, helped with the measurement and also said that the measurement was only eight inches. Other neighbors generally expressed the opinion that defendant's car was quite close to the edge of the black top or beginning of the drainage ditch.

Referring particularly to the wide difference in their respective measurements, defendant at the police court hearing accused plaintiff of perjury. The City Attorney offered to prepare a complaint charging perjury. The Police Judge forbade it "at this time and place". Thereafter defendant communicated with the Prosecuting Attorney of Jackson County, expressing his version of the facts, and asking that the plaintiff be prosecuted for perjury. There was no response. Defendant communicated with the Grand Jury. Again no action resulted. Defendant then wrote to the Attorney General of Missouri, and once more no affirmative action resulted. Then defendant prepared the letter upon which this suit is based, and sent copies by mail to the approximately 250 boxholders in Lake Tapawingo and some to persons residing outside that village. We set forth those portions of the letter which plaintiff claims were libelous, and which were set forth in his petition:

"Fact 4. 'Perjury' is the 'act of swearing that something is true which one knows to be false.' Quoted from Thorndike-Barnhart Comprehensive Desk Dictionary.

"Is Rowden sufficiently stupid that, upon measuring, as he swore he did, he could not tell eight inches from forty-eight inches? Or, did Mr. Rowden deliberately commit 600% perjury and a 600% misdemeanor? How many brownie points are awarded by the Council and the Board for both perjury and a misdemeanor, effected in one full sweep, after 41 days for premeditation? Will the City Government award a blue ribbon; or enforce the applicable code regarding perjury and its own code regarding a misdemeanor? Will the Board appropriate more of your money for a continuation of salary, an increase in salary, a bonus, or perhaps award the man an additional gun, for your more complete 'protection'? * * *"

And on the last page of said letter:

" * * *, can we afford incompetent 600% perjurers on the payroll? * * *"

And continued further on the last page of said letter:

"* * * Certainly not by police who lie in court, for whatever reason. To find the blind leading the blind is common; but to find your home in the reciprocating grips of the criminal and the stupid is a bit disconcerting."

The appeal herein was first lodged in the Supreme Court of Missouri. Defendant asserted that jurisdiction was there vested for the reason that construction of the Constitution of the United States was involved, particularly the First and Fourteenth Amendments guaranteeing freedom of speech and due process. The Supreme Court, Mo., 434 S.W.2d 550, by mandate and opinion, ruled that it had "no jurisdiction on the ground that the construction of the constitution is involved", and transferred to this court.

On appeal defendant's one assignment of error is that the court erred in overruling his motion for directed verdict because the "evidence was constitutionally insufficient to support either a finding of falsity of the alleged libelous statements or a finding of actual malice on the part of defendant."

Generally, the law contemplates that actions for libel shall be tried in the state courts and determined under state law. So far at least, the federal courts have exercised no jurisdiction, original, appellate or otherwise, unless such courts first rule that some federal constitutional right has been impaired, violated or bypassed. The Supreme Court of the United States has, in recent years, so ruled in numerous cases, as we shall develop later herein.

The Missouri Constitution includes a basic and general provision respecting libel and slander. We quote Article I, Section 8, Constitution, 1945, V.A.M.S.:

"That no law shall be passed impairing the freedom of speech, no matter by what means communicated; that every person shall be free to say, write or publish, or otherwise communicate whatever he will on any subject, being responsible for all abuses of that liberty; and that in all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and in suits and prosecutions for libel *the jury, under the direction of the court, shall determine the law and the facts.*" Italics ours.

The Missouri statutory definition of libel may be found in Section 559.410 V.A.M.S. It generally describes libel as "malicious defamation of a person."

The Missouri Supreme Court has ruled in this case that construction of the Constitution is not preserved or involved here so as to confer jurisdiction on that court. However, defendant in his answer, in the oral presentation of his motion to dismiss, in his motion for new trial and in the brief on appeal, has urged that plaintiff's evidence does not make a case for the jury because: plaintiff is a public officer; the statements were made concerning his actions as a public officer; the First and the Fourteenth Amendments to the Federal Constitution guaranteeing free speech and due process, as interpreted and applied by the Supreme Court of the United States, preclude any recovery under the evidence here, since plaintiff did not prove the statement was made with "actual malice", that is, with knowledge that it was false or with reckless disregard of whether it was false or not. That is the sole point presented by defendant on appeal. It is the only issue to be decided. Did the trial court err in refusing to direct a verdict for the defendant? The trial court in denying defendant's motion expressed the opinion that the question of actual malice was for the jury.

Defendant's published statement that plaintiff committed perjury, was a 600% perjurer, was stupid and a criminal, clearly constitutes a libelous statement. Such conclusion, and defendant's publication of the statement, is uncontroverted. On the other hand, the plaintiff Rowden is unquestion-

ably a public official and comes within the purview of the laws of libel with respect to a public official. The Supreme Court of the United States has, first in 1964, and several times thereafter, ruled that for a public official to recover damages for libel he must prove (carrying the burden of proof) that the alleged libelous statement was *not only false*, but was made with "actual malice", that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

Can it seriously be considered that defendant Amick knew or believed that his accusations were false? The factual dispute on which defendant's charge of perjured testimony was based, concerned the distance defendant's automobile was parked from the curb or beginning of the ditch. Plaintiff and the mayor said forty-eight inches. Defendant and neighbor Geiger said eight inches. The variance is probably too great for it to be just an honest mistake. We do not know, after an examination of the transcript, if one, two or all four of the witnesses departed in some degree from the exact truth. We simply say plaintiff has not proved that defendant's statement was false and that defendant knew it was false.

■ We next consider the effect of the jury's finding for the plaintiff and against the defendant, presumably in accordance with the requirement of Given Instruction No. 2, which, after setting forth the alleged libelous statements, required an affirmative finding (prerequisite to a plaintiff's verdict) that such statements were written by defendant with "actual malice, knowing them to be false or with reckless disregard of whether they were true or false, with reckless disregard of plaintiff's rights, and with intent to damage the plaintiff." Although no assignment of error has been made as to Instruction No. 2, we doubt if it is a proper instruction for a libel case brought by a public official. "Actual malice" should be therein defined as "that is, knowing them to be false or with reckless disregard of

whether they were true or false." Furthermore, adding disregard of plaintiff's rights and with intent to damage plaintiff constitutes no part of the required test, and invites a verdict if defendant sought to damage plaintiff. In addition, while this instruction is designated as MAI 23.06, modified, the Committee's comment as to it, and on the same page, states: "The instructions in this book do *not* cover libel actions based on criticism and censure of public officials for either their public or private conduct. * * * see New York Times Co. v. Sullivan, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] * * *".

The Missouri Constitution (Article I, Section 8, supra) declares that "in suits and prosecutions for libel the jury, under the direction of the court, shall determine the law and the facts." Almost identical provisions are found in the Constitutions of New York and Alabama. Article I, Section 8, New York Constitution, Article I, Section 12, Constitution of Alabama. However, our Missouri courts, after giving due consideration to this constitutional directive in libel and slander cases, have consistently held that the court nevertheless has the authority to pass upon the sufficiency of the petition and the evidence, and when the petition is insufficient or the evidence does not make a submissible case, is duty bound to dismiss the complaint and direct a verdict. Bernhardt v. Armbruster, Mo.App., 217 S.W.2d 759. The Supreme Court of the United States in opinions which we shall hereinafter discuss, has also ruled that the court is duty bound to, and should determine if, under the evidence, plaintiff has made a submissible case. After so holding in numerous cases, the court then, in all but one of the cases, ruled that the evidence was insufficient, the case was not submissible, and proceeded to reverse outright judgments awarding damages.

New York Times Co. v. L. B. Sullivan, 376 U.S. 254, 84 S.Ct. 710 (717, 725, 726, 728, 729) arose out of the New York Times' "editorial" advertisement which was signed

by Negro and Alabama clergymen appealing for funds to aid in registering Negroes in Alabama and combatting a "wave of terror" in Montgomery, Alabama. The defendant Sullivan was one of three elected Commissioners in Montgomery, Alabama, who were in charge of the police in that area. The advertisement charged that the police officers had expelled students from the University of Alabama for singing "My Country 'Tis Of Thee", had "ringed the capitol with police", "bombed the home of Dr. Martin Luther King, almost killing his wife and children"; that the police had assaulted his person, had arrested him seven times for speeding, loitering and similar offenses, and other acts of oppression in office. Other alleged libelous statements were contained in the article, but these are sufficient for our purpose since they are clearly libelous and since it was furthermore uncontroverted in the case that some of the statements were inaccurate and untrue.

Plaintiff Sullivan sued for libel. The Circuit Court of Montgomery, Alabama, rendered judgment for him in the sum of $500,000.00. The Supreme Court of Alabama affirmed. The Supreme Court of the United States granted certiorari and in an opinion by Mr. Justice Brennan, (March 9, 1964) reversed outright. The majority opinion stated in part:

"* * * We reverse the judgment. We hold that the rule of law applied by the Alabama courts is constitutionally deficient for failure to provide the safeguards for freedom of speech and of the press that are required by the First and Fourteenth Amendments in a libel action brought by a public official against critics of his official conduct."

Making reference to the old libel law defense, of truth, with the burden cast on the defendant, the court said:

"* * * Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. * * * The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments."

The Court then proceeded to specifically declare the rule, which it has approved in many opinions since. We quote it:

"The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

Then the Court, even though the Alabama State Constitution states that the jury shall "determine the law and the facts" proceeded to review the evidence to determine if a submissible case had been made. We quote further:

"This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated.' * * * In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' * * *."

The Court then weighs the evidence for its sufficiency and concludes:

"* * * The case of the individual petitioners requires little discussion. Even assuming that they could constitutionally be found to have authorized the use of their names on the advertisement, there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard. The judgment against them is thus without constitutional support.

"As to the Times, we similarly conclude that the facts do not support a finding of actual malice. The statement by the Times' Secretary that, apart from the padlocking allegation, he thought the advertisement was 'substantially correct,' affords no constitutional warrant for the Alabama Supreme Court's conclusion that it was a 'cavalier ignoring of the falsity of the advertisement (from which), the jury could not have but been impressed with the bad faith of The Times, and its maliciousness inferable therefrom.' The statement does not indicate malice at the time of the publication; even if the advertisement was not 'substantially correct'—although respondent's own proofs tend to show that it was—that opinion was at least a reasonable one, and there was no evidence to impeach the witness' good faith in holding it. * * *"

In the New York Times decision three Justices (Black, Douglas and Goldberg) went further and expressed the view that the citizen and the press each has an "absolute, unconditional privilege to criticize official conduct despite the harm which may flow from excess and abuses." This view would place such comments under the same unconditional privilege as statements made in court or on the floor of Congress.

A candidate for public office publicly accused a deputy sheriff of receiving money, and implied bribery. The deputy sher-

iff sued in the state courts for libel. He had a verdict and judgment. The Supreme Court reversed, St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262, holding that reckless conduct as to libel publication is not measured by whether a reasonably prudent man would have published or would have first investigated before publishing. The opinion states:

"* * * There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

A newspaper columnist allegedly imputed mismanagement and peculation to plaintiff, who with County Commissioners, was in charge of a ski recreation area. The supervisor sued and was awarded damages. The Supreme Court of the United States reversed in conformity with New York Times, and remanded on other points. Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597.

An Associated Press reporter who claimed he was an eyewitness, wrote an article charging that General Edwin R. Walker had personally taken control of a crowd on the University of Alabama campus and led a charge against federal marshals. The article also alleged that Walker gave the crowd technical, tactical advice, especially on how to · combat the effect of tear gas. The Supreme Court held, even though some of the statements were untrue, that no "actual malice" had been shown as to the Associated Press. The Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094.

In Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125, the defendant was the District Attorney of Orleans Parish. He was convicted of criminal libel for making a statement at a press conference disparaging the conduct of the eight criminal judges of the parish. Among other things, he referred to the

"racketeer influences on our eight vacation-minded judges." The Supreme Court reversed and held the New York Times decision applied to criminal libel and required proof of "actual malice" as defined by that case, before there could be a recovery.

We would like to refer to the well-considered opinion by Mr. Justice Silverman of the Supreme Court, New York County, New York, in Pauling v. National Review, Inc., 49 Misc.2d 975, 269 N.Y.S.2d 11. Dr. Pauling was a world-famous scientist, winner of a Nobel prize for chemistry and a Nobel peace prize. He voluntarily engaged in public discussion of American foreign policy, visited Moscow, attended a world peace conference, supported the Viet Cong in their war against America, urged resistance to the draft, and as a result of these and other similar activities the National Review published an article about him indicating that he was, or at least posing an inquiry if he were, a Communist, or a collaborator. Pauling sued for libel. Mr. Justice Silverman said, page 20:

"* * * So I should make clear that on the basis of pre-N. Y. Times v. Sullivan law, plaintiff would have proved a prima facie case. The articles on their face are libelous, i. e., defamatory if untrue; the defenses of truth, fair comment without malice, etc., to the extent thus far gone into, all present questions of fact for the jury. Publication of the article by the corporate defendant, with the active participation and approval of the individual defendant editor, is conceded. * * *"

"But, applying New York Times Co. v. Sullivan, I hold that plaintiff has failed to prove a prima facie case, and the complaint must be dismissed."

The judgment for Butts in the case of Curtis Publishing Co. v. Butts, 388 U. S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094, is the only one of these judgments for libel in recent years which the court has permitted to stand. In an article in the Saturday Evening Post, Wally Butts, Athletic Director of the University of Georgia, was accused of giving "Georgia's plays, defensive patterns, all the significant secrets Georgia's footbal team possessed" to Paul Bryant, head football coach of the University of Alabama, just prior to the football game between the two universities. The information came to the Post as the result of an electronic error which allegedly enabled one George Burnett to overhear a conversation between Butts and Bryant. The Post made no effort to check the reputation of Burnett. It developed at the trial that he had been convicted on a bad check charge. The reporter who developed the article was not an expert on football, and the Post did not secure the services of an expert in editing the article. There was evidence at the trial that the information allegedly transmitted was nothing more than would be readily available from viewing films of a football game or might be secured from "scouting" a team in action—practices that are in widespread use and commonly authorized. The court again paid homage to the New York Times opinion, stated that the press has a public duty to comment and describe data, information and news of public interest, and held that the athletic director of a large university is such a public figure that the "public official" rule applies to him. The court reviewed the evidence and determined that the Post had been so careless in preparing the article for publication as to make it a proper question for the jury as to whether or not it had shown "actual malice", that is, reckless disregard of whether the libelous statements were false or not. All of the cases we have reviewed specifically approve the New York Times decision.

Originally under the laws of libel, it was possible to libel the government. Manifestly libel of government is actually criticising government officers, who at any given time constitute the government. Even in our own country's early day we had

the hotly-contested Sedition Law, under which it was made a crime to criticize the government, the President, members of Congress, or almost anyone in authority. Our founding fathers were not far removed from the days when government stifled criticism of itself and its officers under the mask of libel. Our constitutional forebears wanted none of that, so they provided for free speech, free press, free religion, freedom to assemble, and due process of law.

Numerous judges have, especially during recent decades, commented on this conflict or collision between the Constitutional guarantee of free speech and the laws of libel—particularly as to the right of public officials and "public figures" to have protection from defamation. We borrow from just three:

"Imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government." Chief Justice Hughes in De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L. Ed. 278.

"The First Amendment presupposes that right conclusions are more likely to be gathered out of a multitude of doings than through any kind of authoritative selection. To some this is, and always will be, folly; but we have staked upon it our all." Judge Learned Hand, United States v. Associated Press, 52 F.Supp. 362.

"Those who won our independence believed * * * that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely, supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion they eschewed silence coerced by law—the argument of force in its worst form." Mr. Justice Brandeis in Whitney v. People of State of California, 274 U.S. 357, 47 S.Ct. 641, 648, 71 L.Ed. 1095.

The decisions of the Supreme Court of the United States which we have reviewed make it quite evident, we think, that a public official or a public figure cannot recover damages for libelous statements or writings made about him and published, unless he first proves by a preponderance of the evidence that such statements are not only false but were made with "actual malice", that is, with knowledge that the same were false or with reckless disregard of whether they were false or not. These decisions further hold that the court should review plaintiff's petition and consider plaintiff's evidence. If the petition is insufficient it should be dismissed. If the evidence does not make a submissible case under these declared requirements, a verdict for defendant should be directed, and an appellate court under such circumstances, if a judgment has been entered, should reverse it.

Quite definitely the plaintiff Rowden was at the time a public official. Of course, he was not a president, a governor, mayor of a metropolitan city, or even a deputy sheriff. He was not a candidate for any of these positions. He was just a deputy marshal in a village of some 1,000 persons, but insofar as the 250 families residing in Lake Tapawingo were concerned, his actions and activities were of real concern. The range of official activities, personal and official actions taken by him, were probably of more direct concern to the persons residing within his jurisdiction than were the doings of the Director of the F.B.I. Many times these

small community citizens (and metropolitan area citizens), sometimes for good reasons and sometimes for bad, wish to bring about the removal of police (and other) officers. It becomes a matter of importance to them, and under our democratic processes of government, fitness or unfitness to hold office may be and usually is, debated, discussed and finally determined.

We note, too, that the defendant is not a candidate for, nor holder of any public office. He is just a citizen living in a small village, in a metropolitan area, who believed he had been imposed upon and oppressed by the local officialdom. He is an unknown citizen and the controversy directly affects only a few persons. He is, however, just as much entitled to exercise the right of free speech, to criticize public officials—the governor or deputy city marshal—and have due process as are the large and powerful New York Times or a candidate for United States Senator. Undoubtedly he had become prejudiced against the plaintiff, and sought his removal from office. Is the New York Times free from bias and prejudice in its editorial expressions or slantings of the news? Does it seek to defeat candidates and remove officials?

In days gone by, persons decided in personal combat to get revenge or have "satisfaction" for insults and defamation. In recent years the pendulum has apparently swung toward mob marches, confrontations, and physical violence against other persons and their property.

Today no group and no person, outside the totalitarian states, is exempt from defamatory criticism. It is poured, not only on elected officials and candidates for public office, but on the police, the bar, and the clergy. Presidential secretaries, cabinet officers and members of the Supreme Court are attacked viciously. As Judge Hand put it: "To some this is, and always will be, folly; but we have staked

upon it our all." We can only hope that from the debate and discussion of our public servants will come better servants; that the worthy will be rewarded and the unworthy be punished; that right will prevail and justice triumph.

■ We find no evidence whatever that the defendant was aware that any of his statements were erroneous. There is nothing to impeach his expressed belief that they were true. Defendant frankly confessed that he was seeking plaintiff's removal from office. To that extent and to that degree, he was actuated by malice. He persistently sought to bring about plaintiff's official downfall. He sought it with the Prosecuting Attorney, with the Grand Jury, with the Attorney General, and finally with his fellow citizens of Lake Tapawingo. He was persistent. He was probably by most standards overzealous, but was he guilty of "actual malice" as defined by the New York Times decision and the other decisions which follow it? We think not. The New York Times' Secretary testified that he thought the advertisement was "substantially correct." It was not disputed but that it contained some untrue statements. Defendant Amick testified that his "advertisement" or letter was "completely correct" not just "substantially correct."

It is our opinion that plaintiff's evidence fails to make a submissible case under the post-New York Times decisions. Defendant's motion for directed verdict should have been sustained.

The judgment for plaintiff is reversed.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.