Gregg F. SHAFER and Glenna R.
Shafer, Plaintiffs-Appellants,

v.

LAMAR PUBLISHING COMPANY, INC.,
Defendant-Respondent.

No. WD 31910.

Missouri Court of Appeals,
Western District.

Aug. 4, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 15, 1981.

Samuel J. Short, Jr., Stockton, for plaintiffs-appellants.

Gordon R. Boyer, Boyer & Ratzlaff, Lamar, for defendant-respondent.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

Gregg Shafer and his wife Glenna brought suit against the Lamar Publishing Company for libel flowing from an article published in the Democrat, a newspaper circulated in Barton County. Upon a jury being waived, the cause was tried by the court. The court entered judgment for the newspaper and Shafer and his wife appeal.

The Shafers contend that he was not a public official by reason of his position as a police officer; that the article was concerned with a controversy over the police chief in which Shafer was not involved; the libelous words related to Shafer in his private capacity and the evidence showed the words were printed with actual malice. Affirmed.

Shafer had been a policeman in Golden City, located in Barton County, for about a year when a controversy arose over the firing of Herb Orton, the police chief. There were only two members of the police department, Orton and Shafer.

The city council of Golden City held a meeting on June 8, 1976, to discuss the question of police chief Orton. From the evidence it was apparent there was a deep controversy in the community over whether or not Orton should be fired. None of the questions concerning the retention or firing of Orton involved Shafer directly. However, with a two-man police force, the obvious situation arose as to whether or not Shafer would replace Orton if Orton were fired. Apparently there was a division of opinion on the desirability of this possibility.

A number of citizens appeared at the council meeting on June 8 who were interested in the police force situation. The Democrat ran an account of the meeting on the front page. The article in full is set out in the appendix.

This lawsuit is founded on the reference to Shafer near the end of the article which states: "The council heard one man accuse Shaffer [sic] of 'knocking up' his 16-year-old daughter." Shafer alleges that statement was libelous and he and his wife were entitled to actual and punitive damages.

Shafer first contends that the court erred in finding that he was a public figure and his case should, therefore, be measured by the standards applicable to private individuals. The distinction between public figure and public official is meaningless under the standards applied to libel suits by the Supreme Court of the United States. *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Although the trial court found Shafer to be a public figure, he is rather a public official within the meaning of *New York Times Company v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) as was held by this court in *Rowden v. Amick*, 446 S.W.2d 849 (Mo.App. 1969). The St. Louis District reached the

same conclusion in *Ramacciotti v. Zinn*, 550 S.W.2d 217 (Mo.App.1977). The rationale for holding a police officer to be a public official was stated by this court in *Rowden* at 446 S.W.2d 857[3] as resting on the importance to the citizens of the actions of police officers. This court further noted at page 858 that under our democratic processes the fitness or unfitness of police officers in small communities may be and usually is debated and discussed. Under *Rowden* and *Ramacciotti* there is no doubt that Shafer was a public official within the meaning of *New York Times.*

■ Shafer next contends he was not involved in the controversy relating to Orton and since the article was concerned with Orton, he was improperly mentioned. As heretofore noted, Golden City had only two policemen and the resignation of Orton would leave only Shafer on the police force, at least for some period of time. The qualifications and fitness of Shafer to be the only police officer, or to possibly become chief of the police department, was a matter of concern to the citizens of Golden City about which they expressed their feelings at the meeting. For that reason, the article necessarily referred to Shafer in order to fairly and accurately report the meeting.

■ Shafer next contends the statement made about him and his relationship with a sixteen year old girl concerned his private activities and had nothing to do with his activities as a police officer. In *Garrison v. State of Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) the court at 85 S.Ct. 217[13] stated:

"The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character."

The statement regarding Shafer certainly bore on his qualification to be a police officer or to be the chief of the police department. Police officers of course come in contact with all people and certainly it would be a matter of concern if a police officer were one who would have illicit sex relations with young girls. While the comment may have referred to private conduct, it certainly bore on Shafer's fitness for office and thus touched on his fitness to hold office.

The court found the article to be privileged and Shafer challenges this finding by stating the evidence showed the existence of actual malice on the part of the newspaper, or the article was published with reckless disregard of whether it was true or false. Additional reasons listed under this point have heretofore been dealt with.

The test to be applied to determine liability for libel of a public official as stated in *New York Times* is well known. However, this case falls in an area which is not precisely covered by any case cited or located by this court in its exhaustive research. This case involves an action for libel against a newspaper for reporting a statement made at a public meeting of the city council which beyond doubt accused Shafer, a police officer and public official of the city, of the crime of statutory rape. Section 559.-300, RSMo 1969. However, Section 611, Restatement (Second) of Torts, covers this situation and this court adopts the Restatement position and its rationale. Section 611 states:

"The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."

The comments under Section 611 state in part:

*a.* "The privilege of the publication of reports of defamatory statements covered in this Section is not an absolute privilege. . . . The basis of this privilege is the interest of the public in having information made available to it as to what

occurs in official proceedings and public meetings. The privilege is therefore one of general publication and is not limited to publication to any person or group of persons. For the same reason the privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false. Abuse of the privilege takes place, therefore, when the publisher does not give a fair and accurate report of the proceeding."

b. "The privilege stated in this Section permits a person to publish a report of an official action or proceeding or of a public meeting that deals with a matter of public concern, even though the report contains what he knows to be a false and defamatory statement. The constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgement.

\* \* \* \* \* \*

"If the report of a public official proceeding is accurate or a fair abridgement, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy."

d. "The privilege covered in this Section extends to the report of any official proceeding, or any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions. Since the holding of an official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken."

"f. Accuracy and fairness of report. The rule stated in this Section requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings.

"Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties."

"i. Public meetings. The privilege covered by this Section also extends to a report of any meeting, assembly or gathering that is open to the general public and is held for the purpose of discussing or otherwise dealing with matters of public concern. As in the case of the report of official proceedings, the purpose of the privilege is to protect those who make available to the public information concerning public events that concern or affect the public interest and that any member of the public could have acquired for himself by attending them."

In Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) the court considered the publication of statements made at a public meeting of a city council about a developer who had attained the status of a public figure. While the court did not reach the issue presented in this case because it held the language used by persons at the meeting did not accuse the developer of a crime, the court made the following statements at 90 S.Ct. 1540, 1541[8] about the First Amendment concern embodied in the right of a newspaper to report on public meetings and these concerns can be found to be expressed and protected in Section 611:

" 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means * * * is a fundamental principle of our constitutional system.' *Stromberg v. California, supra,* 283 U.S. [359] at 369, 51 S.Ct. [532] at 536[, 75 L.Ed. 1117]. Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093. Because the threat or actual imposition of pecuniary liability for alleged defamation may impair the unfettered exercise of these First Amendment freedoms, the Constitution imposes stringent limitations upon the permissible scope of such liability.

"It is not disputed that the articles published in the petitioners' newspaper were accurate and truthful reports of what had been said at the public hearings before the city council."

The existence of a qualified privilege for a newspaper to publish statements made at a public meeting about matters of public concern is recognized in 53 C.J.S. Libel and Slander § 123a and b, and Prosser, Law of Torts, 4th Ed. (1971) p. 830.

The *New York Times* test of actual malice or reckless disregard of falsity does not reach the entire problem presented by a newspaper report of statements made at a city council meeting. This for the reason that a publication would be unable to report any adverse statement made about a public official at a public meeting if that publication did have actual malice toward the individual who was the subject of the comment, and if it knew the comment was false. In short, a publication would be prohibited from reporting fully all the occurrences of a public meeting if such report included derogatory comments about a public official against whom the publication did entertain actual malice or knew the statement was false.

This unprotected area was discussed in 77 Columbia Law Review "Constitutional Privilege to Republish Defamation" at p. 1267:

"Certainly, *New York Times* would protect a republisher of defamation about a public figure who neither knows nor believes the republished accusation to be false. There is, however, one situation in which *New York Times* fails adequately to protect a first amendment interest in republication. Some defamatory accusations are of legitimate public interest merely because they are made, regardless of whether they are true or false. Even if the republisher knows such an accusation to be false—and is therefore unprotected by *New York Times*—he should still be constitutionally privileged to repeat it. Thus, a supplemental privilege is needed to safeguard this special first amendment interest."

■ This court now fills the gap above discussed by the adoption of Section 611 of the *Restatement* and its rationale. The *Restatement* grants a qualified privilege for the fair and accurate reporting of a public meeting dealing with a matter of public concern with the privilege destroyed only on a showing that the report is not fair and accurate or a fair abridgement. Thus, the question of actual malice, or knowledge of falsity, or reckless disregard of falsity, in this type of case becomes immaterial and the test rather is whether or not the report is fair and accurate.

There is no contention that the report in the Democrat was not fair and accurate. The qualified privilege which the Democrat had to report what was said at the public meeting of the city council about a matter of public concern is therefore unchallenged on the ground upon which it rests.

It should be noted that the Democrat article went beyond a report of what was said at the public meeting when the article stated: "What that has to do with Orton is vague, but the man may have been upset because he felt the council was opposed to a man like Orton, yet seemed to be favoring a man like Shafer." No contention is made

that this sentence constituted libel. The only contention concerns the statement quoted concerning the daughter of the man who addressed the council.[1]

Shafer finally contends that malice was shown by the intemperate and extravagant words which were used and by the failure of the newspaper to investigate the truth of the words spoken.

■■■ The court in *Greenbelt Cooperative Publishing Ass'n* held that a jury instruction that malice could be found from the language of the publication itself was error of constitutional magnitude. Thus, malice may not be found solely from the language used in this case. In *St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968) the court stated that failure to investigate does not in itself establish bad faith. More importantly, in this case the privilege which the Democrat enjoyed was to report the public meeting held by the city council. As held above, the obligation which the Democrat had was to publish a fair and accurate account of the meeting. The Democrat was not responsible to investigate the truth or falsity of the statement made about Shafer. The fact that a statement was made in a public meeting concerning a matter of public concern, i. e., fitness of a police officer, gave the Democrat a qualified privilege to fairly and accurately report the statement made about Shafer. The article was a fair and accurate report, thus the qualified privilege bars recovery by the Shafers.

The judgment is affirmed.

All concur.

### APPENDIX

### POLICE CHIEF RESIGNS

#### MORE TROUBLE FOR GOLDEN CITY

There's trouble in Golden City and it centers around the resignation this week of Police Chief Herb Orton.

Orton today issued a statement saying he is giving the city 30 days' notice and intends to quit as of July 15. Orton wouldn't say anything more about the reasons for his resignation and Golden City Mayor Lowell Pugh said he wouldn't make any comment on it until after the next council meeting on June 21. Pugh said the council hasn't seen Orton's resignation letter and that's why he didn't want to comment at this time.

However, the Democrat learned from other sources that some council members wanted to get rid of Orton. Former Mayor Harold Keatts described the situation as "a real mess." He said the council held a special meeting Tuesday night in which about a dozen observers were asked to leave after Mayor Pugh invoked provisions of the Sunshine Law to discuss personnel matters.

In his statement Orton says: "I wish to take this opportunity to express my appreciation for all the assistance I received from the Circuit and Magistrate Courts, the locally assigned Missouri Highway officers, the Barton County law officers, other neighboring county and state law officers, the former City Council members and citizens of Golden City while I held the position of Chief of Police at Golden City. I regret that I feel it is necessary to resign; however Golden City still has the services of a young patrolman who has been in training for a number of months."

The council apparently was divided on Orton, some supporting him and others urging he be ousted. He reportedly was given the choice of resigning or being fired after the ouster group prevailed.

Former Mayor Keatts described Orton as a good and decent man who has the support of many people in Golden City. Keatts said he didn't know of any specific charges against Orton.

Supporters of Orton apparently became upset when they learned the council was about to ask Orton for his resignation. They appeared at Monday's regular council meeting, but the subject never came up.

---

1. Those interested in the right of a newspaper to comment or draw inferences may consult *Warren v. Pulitzer Pub. Co.*, 336 Mo. 184, 78 S.W.2d 404, 413[9–11] (1934). Of course, Warren must be read in the light of *New York Times* and subsequent cases.

The supporters then heard late Tuesday that the council was having a specially called meeting and they attended again, but were asked to leave.

The "young patrolman" Orton referred to in the above statement is Gregg Shafer. The council heard one man accuse Shafer of "knocking up" his 16-year-old daughter. What that has to do with Orton is vague, but the man may have been upset because he felt the council was opposed to a man like Orton, yet seemed to be favoring a man like Shafer.

Other sources said Golden City residents may be circulating petitions opposing the council's action.

Orton has been Golden City's police chief about four years. He also is a deputy sheriff of Barton County. Before coming to Golden City he was assistant chief of police at Webb City.