William RAMACCIOTTI,
Plaintiff-Respondent,

v.

Fred ZINN, Defendant-Appellant.

No. 37936.

Missouri Court of Appeals,
St. Louis District,
Division Two.

April 19, 1977.

Phillip E. Fishman, University City, for defendant-appellant.

Cook, Murphy, Lance & Mayer, Daniel J. Murphy, St. Louis, for plaintiff-respondent.

McMILLIAN, Presiding Judge.

Defendant appeals from a jury verdict awarding plaintiff $10,000 in actual and punitive damages on plaintiff's four-count libel and slander action. The suit originally contained five counts but plaintiff voluntarily dismissed Count II. Count I was based on an allegedly defamatory memoranda; Counts III, IV and V involved allegedly slanderous incidents. Recovery on defendant's counterclaim, premised on slander of defendant by plaintiff, was denied by the jury.

On appeal, defendant contends that the trial judge should have directed a verdict for defendant on Count I at the close of plaintiff's evidence because: (1) plaintiff failed to prove publication of the memorandum which forms the basis of Count I; (2) the contents of the memorandum were substantially true; (3) defendant had an absolute privilege to forward an internal communication containing information critical of a subordinate to another city official, and (4) the contents of the memorandum should at least to qualifiedly privileged and no malice was shown. In addition, defendant claims entitlement to a directed verdict on Counts III, IV and V of plaintiff's petition, the slander counts, on the ground that the statements were not actionable per se and that plaintiff failed to prove publication of the allegedly slanderous statement. De-

fendant further asserts on a variety of grounds, that the jury verdict was excessive. Finally, defendant contends that error in the verdict director as to Count I necessitates a new trial.

We agree with defendant that the error in the verdict director mandates a new trial, but reject all of defendant's arguments as to the propriety of a directed verdict.

During the pendency of this appeal, defendant Fred Zinn died and his wife, the executrix of his estate, was substituted as a party.

At the time of trial in January, 1975, plaintiff Ramacciotti had been a police officer for the City of Webster Groves for ten and one-half years and had held the rank of sergeant for five and one-half years. There was some testimony that plaintiff had a general reputation of questioning the orders of superiors. At the same time, Ramacciotti had received eleven commendations during his period of service. Defendant Zinn had been with the Webster Groves Police Department since 1948 and was Chief of Police from 1964 to 1974.

As of July 1973, the only detrimental information that Zinn knew about Ramacciotti was that ". . . he was a loner and Captain Potthoff and Colonel Kuhlmann had advised me prior to that that he constantly questioned orders . . . [t]hey implied . . . that he was obstructionary. . . ." Nevertheless, early in July of 1973, Zinn offered Ramacciotti a promotion to lieutenant. Ramacciotti told Zinn that he could not accept the promotion because he intended to leave the department in the near future. At trial, however, Ramacciotti testified that his real reason for refusing the promotion was certain conditions placed on the promotion by Zinn. Allegedly, Zinn suggested to Ramacciotti that as a lieutenant he would be in a position to gather information on a certain captain whose dismissal Zinn felt was warranted. Zinn contended that if any such proposition was made it was only intended in terms of acquiring information to assist this captain in improving efficiency and morale.

On July 16, 1973, Zinn inserted a memo into Ramacciotti's personnel file noting Ramacciotti's rejection of the promotion and the reasons stated for the refusal and ". . . suggesting that Sgt. Ramacciotti seperate (sic) from this Dept through Voluntary Resignation in the best interest of Dept efficiency." Zinn did admit that he was disappointed that Ramacciotti refused the promotion.

On the same day, Ramacciotti met informally with Kenneth Thein, a member of the Police Advisory Board. Ramacciotti advised Thein of the proposition and the conversations he had had with Zinn regarding the promotion to lieutenant. As directed by Thein, Ramacciotti later submitted his grievances against Zinn in writing to be forwarded to the City Manager and the Police Advisory Board. Sometime shortly after July 16, 1973, Zinn went to Thein and requested a copy of Ramacciotti's complaint. Thein refused to give Zinn a copy of the complaint.

On September 15, 1973, on Zinn's recommendation, Ramacciotti was demoted to the rank of patrolman for failure to follow the Webster Groves Police Department chain of command by filing his grievance with the Police Advisory Board.

On September 16, 1973, at a squad meeting for Ramacciotti's shift, the incident occurred which formed the basis of Zinn's counterclaim. Zinn contends that Ramacciotti made a slanderous statement to others present at the meeting as to Zinn being under investigation by the FBI for misappropriation of federal funds. Ramacciotti and his witnesses testified that he merely asked a question to clarify a rumor that Zinn was under FBI investigation. Ramacciotti claimed that Thein had related this rumor to him. Thein denied this.

Approximately an hour after the squad meeting, Ramacciotti was summoned to Zinn's office. Zinn said that he called Ramacciotti to his office to clarify the situation about the statement in the squad meeting. Ramacciotti refused to enter Zinn's office unless accompanied by a witness of

his choice to guard against the possibility of misquotation. Zinn then issued a direct order to Ramacciotti to enter the office or face immediate suspension for an indefinite period. Ramacciotti refused to comply with the direct order and was immediately suspended.

Ramacciotti appealed the September 15 demotion and the September 16 suspension to the Webster Groves Personnel Board. Zinn testified at the hearing. On November 24, 1973, the Personnel Board reinstated Ramacciotti to the rank of sergeant finding that:

"The fact that he did, in this instance, go outside the chain of command to seek assistance in resolving a complaint which he had against his department head might be interpreted as insubordination. However, the Board feels that his action was the result of the lack of clear-cut procedures for handling this type of complaint rather than insubordination."

The Personnel Board also apparently considered the issue of Ramacciotti's September 16 suspension and found a two-month suspension warranted.

Under procedures of the City of Webster Groves, determinations of the Personnel Board are reviewed by the City Manager who may either accept the Personnel Board's recommendations or make an independent determination. On October 29, 1973, before City Manager Siems had made his decision, Zinn prepared a memorandum which forms the basis of Count I of Ramacciotti's petition. The memorandum stated that:

"October 29, 1973

"To: Fred Siems, Acting City Manager
From: Fred L. Zinn, Chief of Police
Subject: Ptn. William Ramacciotti

"Sir:

This memorandum has been prepared to bring to light certain facts that were deliberately withheld at the appeal on the part of Ptn. Ramacciotti for reinstatement, before the Board of Personnel.

"The facts contained herein were withheld to protect the City Council, the City Manager and the Police Department from adverse publicity through the news media. Preoccupation in my normal duties have precluded my noting exact times and dates of unpleasant behavior on the part of police officers; hence, the information forwarded here alludes to Ptn. Ramacciotti's attitude and insolent behavior over the past several years.

"Item: Lt. E. R. Potthoff, retired, complained repeatedly that Ptn. Ramacciotti's attitude was consistently arrogant and insolent.

"Item: Lt. Col. Henry Kuhlmann complained that Ptn. Ramacciotti continually questioned supervisors as to the appropriateness of assignments.

"Item: Major Clyde Wallace has complained that Ptn. Ramacciotti was, at least on one occasion, out of uniform, and wore a firearm that was not acceptable to the chief's office, even after having been advised not to wear weapons of that character.

"Item: Major James E. Scavatta stated that Ptn. Ramacciotti was a trouble maker within the department as he was vicious and treacherous.

"Item: Capt. Earl Reiner asked that Ptn. Ramacciotti be assigned to units other than that unit under Capt. Reiner's command. Capt. Reiner stated that from his personal observations, Ptn. Ramacciotti was arrogant overly critical of Department policies and programs, and was, in fact, a dissident.

"Item: Mr. William Symes complained to the Chief of Police that Ptn. Ramacciotti appeared before an executive meeting of the City Council and appeared arrogant and through his (Ramacciotti's) dialogue, attempted to speak "down" to the Council.

"Item: Lt. Det. Jack V. Crittendon complained that he had suggested to Ptn. Ramacciotti that the Department's telephone and radio recording tapes were out and should be replaced, and he, Ramacciotti, said 'fuck you and fuck the tapes, too.'

"Item: Lt. Delmont Reinemer complained that Ramacciotti insulted him in

public saying in presence of others, 'What are you—Zinn's butt boy?'

"Item: Chief Fred L. Zinn has on at least 12 occasions attempted to discuss this and other matters with Ramacciotti in an attempt to get to the bottom of his problems, and on each of these occasions Ramacciotti refused to discuss the matter.

"Item: Lt. David Westbrook stated that Ramacciotti openly and in the presence of other officers stated, 'the FBI is investigating Chief Fred Zinn for misappropriating federal funds.' Ramacciotti was given direct orders on three straight occasions to enter the police chief's office and discuss this matter and refused to comply with these orders.

"You are further advised that Major Wallace and Major Scavatta were promoted over Captain Otto Piffel as a result of what I considered a better work performance record by Majors Wallace and Scavatta and on the advice of Lt. Col. Henry Kuhlmann.

"Lt. Col. Kuhlmann while on the stand at the hearing stated that there was dissension from within the Chief's office. This statement is true; however, that dissension involved only Col. Kuhlmann and the Chief of Police. Over the past 10 years as Chief of Police, I have made mistakes on numerous occasions. I have inadvertently hurt the pride of Col. Kuhlmann and Captain Piffel through administrative action which I deemed to be in the best interest of the community. I have never willingly and knowingly hurt anyone. In the interest of police morale, which is down at this time due to the aforestated occurrences, I am strongly urging you to deny reinstatement of Ptn. Ramacciotti to the rank of Sgt. irrespective of what decision the Board of Personnel might make.

"Finally, in the interest of a better community and my personal health, I may have to retire from my office as Chief of Police in Webster Groves. I am deeply involved in many very serious and sensitive community programs related to delinquency control, through improved living conditions and quality of life. Our records of success in these programs and other law enforcement programs are most promising.

"I want to continue working in these areas if at at all possible.

"I am, therefore, strongly urging you to weigh all of the facts including this document, prior to a decision of reinstatement with respect to Ptn. Ramacciotti.

"It is my judgment that reinstatement would have a devastating effect upon our Police Department, morale will decrease, and crime and delinquency might well rise."

At some point, Ramacciotti removed a copy of this October 29 memorandum from Zinn's office and showed it to his wife and his attorney. Ramacciotti also testified that he questioned the persons named in the memorandum as to the accuracy of the statements attributed to them. City Manager Siems was unable to recall from whom he had received the memorandum. Zinn, however, admitted "eventually" sending the memorandum to Siems. Zinn also admitted that he had discussed the memorandum with Majors Wallace and Scavatta.

Defendant's Exhibit B was a memorandum by Joseph Morrison, City Manager of Webster Groves after January, 1974, stating his formal findings and conclusions as to the disciplining of Ramacciotti. According to paragraph 5 of defendant's Exhibit B—

"On November 30, 1973, an informal hearing was held before the then acting City Manager, Frederick R. Siems, Jr., who partially reinstated the pay of Patrolman Ramacciotti to that of Sergeant from and after October 16, 1973, but sustained the suspension from September 16 to October 16, 1973 (in the meantime, Patrolman Ramacciotti was reinstated as Sergeant under a separate proceeding before the Personnel Board of the City of Webster Groves, whose recommendation was accepted by the Personnel Director)."

The background facts above lead us to agree with the finding by the City Manager as stated in Defendant's Exhibit B that

". . . on and after July 2, 1973, the relationship between the Chief of Police and Ramacciotti had broken down to the point where they were not getting along, and there was mutual mistrust."

As previously noted, Count I of Ramacciotti's petition was based on allegedly libelous statements in the October 29 memorandum. Ramacciotti's petition isolated as libelous six of the ten "items" contained in the original memorandum. For our review purposes, it is unneccessary to describe in detail the allegations and counter-allegations surrounding the individual items. Suffice it to say, that Ramacciotti produced four of the five persons to whom statements in the memoranda were attributed and each witness either totally denied making any such statements to Zinn (Reiner) or couldn't recall making any such statement to Zinn (Kuhlmann, Reinemer) or testified that the statement in the memorandum was an inaccurate representation of anything said to Zinn (Scavatta). The remaining "item" referring to Lieutenant Crittendon was characterized by Ramacciotti as implausible in light of the fact that he was not under Crittendon's supervision and had no responsibility for maintenance of the tapes. In response to this testimony, Zinn asserted that the contents of the memorandum were accurate and substantially true but admitted that some of the "items" were paraphrases of complaints. On cross-examination, Zinn testified that most of the complaints included in the memorandum occurred prior to July, 1973, the date of the offer of promotion to Ramacciotti. Zinn stated that when he sent the memorandum, he did not intend to expose Ramacciotti to hatred or contempt or injure him in his occupation but rather sent the memorandum because ". . . it was my judgment, my professional judgment that Patrolman Ramacciotti was a trouble maker . . ." and because he thought that under police rules he was obligated to forward the memorandum to the City Manager who was to rule on the discipline action.

Count III of plaintiff's petition alleged slander in that:

"2. . . . while in the presence and hearing of Major Clyde Wallace, defendant maliciously and falsely spoke of and concerned (sic) plaintiff the following statement or a statement substantially identical thereto: 'Captain Reiner told me that Ramacciotti said you were yellow for not joining the Police Association.' "

Ramacciotti denied making any such statement. Reiner denied making any such statement to Zinn. Zinn admitted making the statement to Wallace.

Count IV of plaintiff's petition alleged slander in that:

"2. . . . while in the presence and hearing of Major James Scavatta, defendant maliciously and falsely spoke of and concerned (sic) plaintiff the following statement or statements substantially identical thereto: 'Ramacciotti referred to you as a snake.' "

Ramacciotti denied making any such statement. Scavatta testified that Zinn made the statement to him. Zinn admitted making the statement to Scavatta, allegedly to clarify a rumor.

Count V of plaintiff's petition alleged slander in that:

"2. . . . while in the presence and hearing of City Manager Joseph Morrison, defendant maliciously and falsely spoke of and concerning plaintiff the following statement or a statement substantially identical thereto: 'Ramacciotti's only goal is to embarrass the City as much as possible and then get the hell out.' "

Ramacciotti denied any intent to embarrass the city. Zinn admitted making the statement but claimed that his statement was in the course of a conversation with Morrison in which Morrison first stated his hope that Ramacciotti would quit. In addition, Zinn claimed that Scavatta had first told him that Ramacciotti's goal was to embarrass the city and then leave. Scavatta denied making any such statement to Zinn and denied that Ramacciotti had ever expressed such a sentiment to him.

As previously noted, a jury returned verdicts for plaintiff on all counts and against

defendant on his counterclaim. This appeal followed.

■ Defendant Zinn first contends in a tripartite argument that the trial court should have directed a verdict for him at the close of plaintiff's case because plaintiff's evidence failed to prove publication. Defendant relies on *Hellesen v. Knaus Truck Lines,* 370 S.W.2d 341 (Mo.1973) for the proposition that ". . . communications between officers of the same corporation in the due and regular course of the corporate business, or between different offices of the same corporation, are not publications to third persons. . . ." *Id.* at 344. See also 50 Am.Jur.2d, Libel and Slander, § 167. Defendant further contends that in light of the very close relationship between the chief of police and the city manager during disciplinary proceedings, as reflected in sections of the Webster Groves city code, the *Hellesen* rule as a matter of law precludes a finding of publication. Defendant's argument is unconvincing for several reasons. First, defendant failed to raise this argument in any post-trial motions and, therefore, failed to preserve the argument for appellate review, Rule 84.-13(a), V.A.M.R. Secondly, we note that the act found insufficient to establish "publication" in *Hellesen* was the corporate defendant's placement of a critical memorandum in its own corporate files which act the court viewed as the corporation merely communicating with itself, *Hellesen v. Knaus Truck Lines, supra,* at 344. In the present case, circulation of the October 29 memorandum was much more widespread in that defendant sent the memorandum to the city manager and discussed the memorandum with Majors Wallace and Scavatta. Finally, the memorandum may not have been sent ". . . in the due and regular course of the corporate business. . . ." *Id.* at 344. The city code provisions characterized by defendant as evidence of the close relationship between the chief of police and the city manager were never introduced at trial and we cannot take judicial notice of municipal ordinances, see cases collected at Mo.Digest, Evidence, Key 32. In addition, defendant was given and did utilize the opportunity to testify at plaintiff's disciplinary hearing.

■ As the second subcontention, defendant argues that the evidence failed to prove any publication which would subject him to liability because plaintiff himself voluntarily disclosed the memorandum after removing it from defendant's office. We recognize the general rule that communication of libelous matter only to the plaintiff who then discloses the information to third parties does not subject defendant to liability, see generally, Annot., 92 A.L.R.2d 219.

The general rule is not, however, designed to insulate a defendant from any liability for libel regardless of his actions simply because the plaintiff discussed the libelous matters with others. Rather, under the general rule, the defendant is freed from liability in appropriate situations because his only act is communicating to the plaintiff. In the present case, however, the defendant admitted preparation of the defamatory memorandum and that he eventually sent it to the city manager. The general rule, therefore, is inapposite to the present case.

■ Defendant's admission that he eventually sent the memorandum to the city manager also serves to rebut his third subcontention that there was no proof of publication by defendant. As a general rule if there is conflicting evidence as to publication, or the evidence is susceptible to different inferences, the question of the sufficiency of publication is to be resolved by the jury, *see* 50 Am.Jur.2d, Libel and Slander, § 151.

■ We conclude, therefore, that "publication" of the memorandum was sufficiently proven to preclude the trial judge's direction of a verdict for defendant.

■ Defendant further suggests that he was entitled to a directed verdict on Count I at the close of all the evidence because the contents of the memorandum were substantially true. Defendant testified that the "items" in the memorandum were substan-

tially true. The alleged makers of the statements, however, repudiated the statements in whole or in part. The jury was properly instructed on the defense of truth, M.A.I.–Civil 32.12. In the presence of such conflicting evidence, the question of truth was properly sent to the jury for resolution, *Moritz v. Kansas City Star Co.,* 364 Mo. 32, 258 S.W.2d 583, 590 (Mo.1953).

■■■ Defendant next contends that the trial court should have either dismissed plaintiff's petition or granted a summary judgment for defendant on the basis that he had an absolute privilege to prepare and forward the critical memorandum. Defendant correctly reports that there is a growing trend to expand the class of persons protected by absolute privilege, *see* generally, Annot., 26 A.L.R.3d 492; 50 Am. Jur.2d, Libel and Slander, §§ 193, 194, 224, 225. In Missouri, however, absolute privilege ". . . is confined to relatively few situations. It is accorded to judicial proceedings, legislative proceedings, proceedings of executive officers charged with responsibility of importance, publications made *with the consent of the plaintiff* and communications between husband and wife. . . ." *Williams v. School Dist. of Springfield R–12,* 447 S.W.2d 256, 269 (Mo. 1969); *Pulliam v. Bond,* 406 S.W.2d 635, 640 (Mo.1966). The grant of an absolute privilege is designed for those situations where ". . . [T]he tendency and policy of the courts is to not extend the number or instances of absolute privilege unless the policy upon which privilege is based is found to exist in the new situations. . . ." and ". . . the better public policy 'regards the ends to be gained by permitting such statements as outweighing the harm which may be done to the reputation of others.' . . ." *Laun v. Union Elec. Co. of Missouri,* 350 Mo. 572, 166 S.W.2d 1065, 1068–9 (1942) quoting 3 Restatement, Torts, p. 224; 50 Am.Jur.2d, Libel and Slander, § 194. We perceive no policy rationale to extend the total immunity of absolute privilege to a memorandum comprised of obvious hearsay and rumor and published out of the ordinary course of the disciplinary proceedings. At oral argument, defendant's attorney questioned the logic of refusing to extend absolute privilege to the memorandum in light of the fact that defendant would have been protected by absolute privilege if he would have related this information during the actual disciplining hearing. The difference in treatment of the statements in the two situations may, however, be justified because of the existence of the independent supervision and control of the hearing officer and the opportunity at a hearing for plaintiff to explore the truth of the statements, see 50 Am.Jur.2d, Libel and Slander, § 194, fn. 10.

■■■ Although the statements in the memorandum are not protected by an absolute privilege, the statements are qualifiedly privileged by virtue of the rule enunciated in *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964) that:

> "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' —that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

The meaning of this "actual malice" requirement was amplified by the Supreme Court's observation in *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968) that:

> ". . . reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

In a libel or slander action brought by a public official pleading and proving this element of "actual malice" is a prerequisite to recovery. The term "public official" was

specifically left undefined in the *New York Times Co. v. Sullivan, supra,* case. *Id.,* 376 U.S. at 283, fn. 23, 84 S.Ct. 710. Shortly thereafter, however, some meaning was given to the term in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L Ed.2d 597 (1966) when the court observed:

".  .  .  the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have substantial responsibility for or control over the conduct of governmental affairs." (*Id.* at 85, 86 S.Ct. at 676).

Noting that the "actual malice" standard was designed to remove inhibitions to public discussion, the *Rosenblatt* court stated:

"Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply." (*Id.* at 86, 86 S.Ct. at 676)

Courts following *Rosenblatt, supra,* have found a broad spectrum of government employees to be included within the "public official" designation, see Annot., 19 A.L. R.3d 1361. Lower level police officers have frequently been characterized as "public officials," see *e. g. Rowden v. Amick,* 446 S.W.2d 849, 857–58 (Mo.App.1969) (deputy marshal); *Jackson v. Filliben,* 281 A.2d 604 (Del.Sup.1971) (police sergeant); *Moriarty v. Lippe,* 162 Conn. 371, 294 A.2d 326, 330–31 (1972) (patrolman), because the courts have recognized that:

".  .  .  law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. The abuse of a patrolman's

office can have great potentiality for social harm  .  .  ."

*Coursey v. Greater Niles Township Publishing Corp.,* 40 Ill.2d 257, 239 N.E.2d 837, 841 (1968) (patrolman). We conclude that the plaintiff in the present case was a "public official" within the meaning of the New York Times "actual malice" rule.

Because the statements in the memorandum are protected by a qualified privilege, an issue arises as to the existence of such malice as will remove the protection. Defendant contends that he was entitled to a directed verdict on Count I because there was no evidence of malice. We disagree.

■  The trial was conducted, evidence introduced and the appellate argument was premised on the theory that the "qualified privilege" involved was simply the general "qualified privilege" which arises when:

".  .  .  circumstances exist or are reasonably believed by the communicator or publisher to exist in which he has an interest and which casts on him a duty to communicate the alleged defamatory matter to another person or persons having a corresponding interest or duty. .  .  ."

*Turnbull v. Herald Co.,* 459 S.W.2d 516, 520 (Mo.App.1970). This general qualified privilege may be lost if there is evidence of "express malice" or "malice in fact," *see generally, Walker v. Kansas City Star Co.,* 406 S.W.2d 44, 55 (Mo.1966). "Express malice" may be shown by evidence that the defendant published the defamatory matter for a motive inconsistent with the principles giving rise to the privilege. *Boehm v. Western Leather Clothing Co.,* 161 S.W.2d 710, 717 (Mo.App.1942). Falsity of the statements and defendant's knowledge of the falsity might also be evidence of "express malice", *Potter v. Milbank Mfg. Co.,* 489 S.W.2d 197, 204 (Mo.1972).

■  Our review of the transcript reveals sufficient evidence to preclude direction of a verdict under the general principles of qualified privilege and abuse of that privilege. There was evidence of continuing controversies between plaintiff and defendant beginning in July, 1973. In addi-

tion, defendant admitted that most of the "items" included in the memorandum had actually occurred prior to July of 1973 when defendant had offered plaintiff a promotion. Finally, every witness examined denied, in whole or in part, making the statements to Zinn which were attributed to them in the memorandum. From this evidence, the jury might reasonably conclude that defendant misrepresented the facts in the memorandum as part of an effort to drive plaintiff off the police force and, therefore, lose the qualified privilege through abuse.

■ As we have noted, however, the "public official" status of the plaintiff in the present case requires plaintiff to demonstrate "actual malice," basically awareness of the falsity rather than "express malice." Arguably, the witnesses' repeated repudiations of the statements attributed to them in defendant's memorandum constitutes circumstantial evidence that Zinn was aware of the falsity of the statements. Zinn's denial of falsification creates an issue of credibility. We, therefore, hesitate to order the drastic step of a directed verdict even in light of plaintiff's heavier burden of proof to show "actual malice." On the retrial of Count I, both sides might introduce additional evidence oriented toward the "actual malice" test of the *New York Times* case.

■ A new trial as to Count I must be conducted because the plaintiff's verdict director failed to hypothesize the element of "actual malice". In pertinent parts, the verdict director provided:

"Your verdict must be for plaintiff upon Count I of the Petition if you believe:
"First, defendant prepared a memorandum containing the statement . . . [the October 29th memorandum was then reproduced omitting the four 'items' which had not appeared in plaintiff's petition] . . .
"Second, such statement tended to expose plaintiff to hatred and contempt and damaged plaintiff's reputation, and
"Third, such statement was read by Fred Siems, and

"Fourth, that such statement was written knowing it to be false or without knowing whether it was true or false in reckless disregard for the plaintiff's rights.
"MAI 23.06 (Modified)."

The drafter of instructions is advised by the MAI editors that "if the defense of qualified privilege is raised, and the plaintiff claims that the privilege was abused, then paragraph Fourth must also be added," Missouri Approved Jury Instructions, p. 220. The committee comments to MAI 23.06, however, cryptically recognize that paragraph Fourth does not submit the "actual malice" standard developed in New York Times and, therefore, is not applicable to libel actions brought by a public official, *Id.* at 221. A proper instruction in the present case would replace the general qualified privilege and express malice formulation of paragraph Fourth of MAI 23.06 with the "actual malice" language of the *New York Times* and *St. Amant, supra,* cases. For example, the instruction might read:

"Fourth, that when defendant wrote the statements he knew they were false or entertained serious doubts as to their truth."

Such an instruction differs significantly from the verdict director submitted in the present case. The submitted verdict director merely required proof that the ". . . statement was written knowing it to be false *or without knowing whether it was true or false* . . ."* (Emphasis added.) This second part of the disjunctive submission might be read as inviting a verdict for plaintiff based on defendant's mere negligence, *cf. Rowden v. Amick, supra,* at 853. The strong protection afforded by the "actual malice" standard certainly is not obviated by a showing of mere negligence. *St. Amant v. Thompson, supra,* 390 U.S. at 731, 88 S.Ct. 1323.

Since a retrial of Count I is necessary, we need not discuss defendant's contention that the jury verdict was excessive. The two remaining appellate contentions allege that the trial judge should have directed a verdict on the slander counts of plaintiff's

petition. Neither contention was mentioned in defendant's post-trial motions, and, therefore, are not before us for appellate review, Rule 84.13(a), V.A.M.R.

We, therefore, affirm the judgments as to Counts III, IV and V and reverse and remand for a new trial on Count I in accordance with this decision.

STEWART and REINHARD, JJ., concur.