**James W. SNODGRASS, Respondent,**

v.

**HEADCO INDUSTRIES, INC., Appellant.**

**No. WD 31771.**

Missouri Court of Appeals,
Western District.

Aug. 17, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Oct. 5, 1982.

Application to Transfer Denied Nov. 15, 1982.

Lee E. Wells, John R. Fox, Kansas City, for appellant.

Thaine Q. Blumer, Kansas City, for respondent.

Before SOMERVILLE, C.J., and TURNAGE and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

This is an appeal from a judgment in the amount of one hundred ninety thousand and two dollars ($190,002) entered on a jury verdict in favor of plaintiff-respondent James W. Snodgrass. Defendant is a Missouri corporation doing business under the name of Bearing Headquarters Company. This action was on four counts: Count I concerned the alleged violation of the Missouri service letter statute, § 290.140, RSMo 1978; Count II alleged libel from the issuance of the service letter; Count III concerned alleged slanderous statements about plaintiff made by defendant's district and branch managers to its employee Karen Lomax; and Count IV concerned alleged slanderous statements about plaintiff made by defendant's branch manager to Todd Siler of Household Finance Corporation.

The jury found for plaintiff on Count I and awarded $1.00 actual damages and $10,000 punitive damages; for defendant on Count II; for plaintiff on Count III and awarded $1.00 actual damages and $75,000 punitive damages; and for plaintiff on Count IV and awarded $5,000 actual damages and $100,000 punitive damages.

Defendant asserts some thirteen points of error, many of which have several subpoints, in its voluminous 84 page brief. In the interests of clarity, the more general issues will be addressed first, after which more particular evidentiary questions will be considered.

From the evidence at trial, the jury could have reasonably found the following facts to be true. Prior to July, 1977, plaintiff had been employed by Headco Industries, Inc., d/b/a Bearing Headquarters Company (BH) for about three years. His direct supervisors at BH were Jim Maloney, office manager, Richard Bjork, branch manager, Jim Rund, district manager, and Tom Highley, vice-president of BH. At the time he left BH in 1977, his job entailed taking orders from customers over the telephone and locating the requested merchandise.

The jury could have found that on July 27, 1977, plaintiff discovered that a newly-hired employee was being paid a considerable amount more than he or many of the salespersons. Incited by this event, plaintiff confronted the branch manager, Bjork, and voiced his displeasure regarding this pay discrepancy. Bjork informed plaintiff that the new employee commanded the extra salary because he had a college education and that the company could not afford to give plaintiff a raise because it was on an austerity program. Plaintiff stated he

could not work at BH under the circumstances and demanded a raise, which was refused. Although Bjork denies plaintiff told him he was quitting, plaintiff testified that he stated to Bjork that he quit, and several other employees testified that plaintiff had left the office before noon that day and said that he had had "enough of the place," "he was walking out" and "he was quitting." Plaintiff did not return to work that day, a Wednesday, nor the remainder of the week. On July 28, 1977, plaintiff applied for employment at Industrial Bearing and Transmission Company (IBT), a bearing manufacturer in close competition with BH, and was hired to commence two weeks later.

At the end of August, 1977, Karen Lomax was hired as a receptionist by defendant BH. On September 15, 1977, plaintiff returned to BH to pick up a check for vacation pay that had not been given to him with his last paycheck. He met Lomax, and the two began to date that same day. Several days later, Bjork learned that Lomax and plaintiff were seeing each other, and informed his supervisors. Highley gave orders for Rund and Bjork to discuss the matter with Lomax.

On September 17, 1977, Bjork and Rund met with Lomax to discuss her relationship with plaintiff. This conversation provided the basis for Count III of plaintiff's action. The alleged purpose of this meeting was to express the company's concern about company information available to Lomax which might be shared with an employee of a competitor, but the conversation far exceeded this scope. Lomax testified that she was told that plaintiff "had raped their other receptionist" who worked before her; "was involved in a murder"; "had mental problems"; "possessed lewd photographs of the former receptionist which were shown around the BH offices"; "had drugged [the former receptionist] to get her to pose for the pictures"; and "stole from the company." She claimed that the upshot of the meeting was that she "was to stop dating Jim or else they would find a reason to fire me." Lomax testified that the men had told her that both the meeting and her work were confidential. However, she also testified that she and plaintiff had never discussed anything relating to work. The only evidence introduced by defendant that showed any indications of a breach of confidentiality of company business was a memorandum to Bjork from a BH employee wherein the employee expressed a suspicion that information was being passed on to a competitor. However, this memorandum was shown by plaintiff to be dated a week *after* the September 17th meeting with Lomax.

Lomax testified that she left the meeting believing she would not see plaintiff ever again, but that he was persistent in his efforts to convince her that what she had been told by her employers was false or misleading. It took little time for plaintiff to convince her he was innocent, as the two became engaged several days later around the 19th or 22nd of September. Lomax left her employ at BH on October 17, 1977, and she and plaintiff were married on December 17, 1977.

On October 17, 1977, Bjork received a phone call from Todd Siler, an employee of Household Finance Company (HFC). The ensuing conversation provided the basis for Count IV of plaintiff's action. The purpose of Siler's call was to check past employment of plaintiff listed on an application for a $5,000 loan requested by plaintiff and Lomax. Siler asked Bjork about plaintiff's tenure at BH. Bjork stated that plaintiff had been fired from BH for "falsifying information to his boss" and because he was "caught taking company property". Siler testified that prior to this discussion, plaintiff had been qualified for a loan with HFC based on their own grading system, but that he was turned down "because of the problems he had at the former job," and because he had been on his new job for such a short time. Siler said plaintiff would have to have "someone sign with him because of those problems." Although Bjork freely volunteered the above information, he would not disclose plaintiff's salary with BH.

Upon learning of the reason for being rejected for the HFC loan, plaintiff consulted with an attorney, who advised him to seek a service letter from BH. This letter formed the basis for Count I and II of plaintiff's action. The service letter states that the causes for plaintiff's dismissal were as follows:

(a) excessive tardiness;

(b) unexcused and unexplained failure to report to work on July 28 and 29, 1977;

(c) an investigation appeared to give Bearing Headquarters reasonable grounds for believing, and on the basis thereof, the company did believe that Mr. Snodgrass failed to follow accepted company procedure for transferring material between company warehouses, and

(d) an investigation appeared to give Bearing Headquarters reasonable grounds for believing, and on the basis thereof, the company did believe that Mr. Snodgrass criticized the company to various other of the company's employees, and morale problems were created as a result.

Defendant's vice-president Highley testified that the service letter was drafted by an attorney at defendant's home office in Chicago, apparently based on the personnel file kept on plaintiff. The letter was reviewed by Bjork and Rund for accuracy, and signed by Bjork on October 31, 1977. The Personnel Change Notice made out and signed by Bjork on July 30, 1977, listed only three reasons for plaintiff's alleged termination. It did not mention the third allegation in the service letter concerning the failure to follow company procedures regarding the transfer of company materials. Highley later testified that this fourth reason was added after learning that plaintiff was going to sue because of Bjork's statements to HFC on October 17, and they didn't want the statements and letter to conflict. Plaintiff testified that he had never shown the service letter to anyone, effectively discounting any basis for Count II of his action.

Plaintiff left IBT and was hired by Alton Box Co. (ABC) in St. Joseph, Missouri, in November 1978. Defendant subpoenaed Jess Bielby, ABC's office manager, who brought plaintiff's employment application and testified on direct examination that plaintiff was fired by ABC for falsifying information on that application. On cross-examination, Bielby said the specific act of falsification was that plaintiff listed his birthdate as 3–15–57 when in fact he was born 3–15–58. He admitted that there was no minimum age for employment with the Company, other than being older than 16, leaving the implication that the age difference was immaterial. On further cross-examination, Bielby was questioned, without objection, on certain pencilled in comments on the application that read "suing BH" and "BH filed for stealing and mental disorder." Bielby said this information was obtained from BH and written by the president of ABC.

## SERVICE LETTER

Defendant's first point on appeal questions whether the service letter statute, § 290.140, RSMo 1978, is constitutional. Subsequent to the perfection of this appeal, the Missouri Supreme Court has held § 290.140 constitutional in *Hanch v. K.F.C. National Management Corp.*, 615 S.W.2d 28 (Mo. banc 1981), effectively forclosing further question on this point and any question of jurisdiction of this court. Missouri Constitution, Article 5, § 3. *Accord, Rimmer v. Colt Indus. Operating Corp.*, 656 F.2d 323 (8th Cir. 1981); *Herberholt v. dePaul Community Health Center*, 625 S.W.2d 617 (Mo. banc 1981).

Defendant also contends that the trial court erred in failing to sustain its motion for directed verdict because plaintiff failed to establish the contents of the service letter were false. Considering the evidence and all reasonable inferences therefrom in a light most favorable to plaintiff, and disregarding all adverse evidence of defendant, *George v. Howard Const. Co.*, 604 S.W.2d 685 (Mo.App.1980), it is unquestionable that the jury could have found that the reasons

for dismissal stated in the service letter were false, and did not "truly stat[e] for what cause, if any, such employee has quit such service . . . ." § 290.140, RSMo 1978. *See Potter v. Milbank Mfg. Co.,* 489 S.W.2d 197 (Mo.1972).

Much of the argument and evidence at trial was oriented toward proving the reasons stated in the service letter were not false. There was evidence of mishandling of company transfer slips, of tardiness, and of controversy stirred up by plaintiff's discovery of the new employee's higher salary. The fact that plaintiff did not report to work on July 28th and 29th is undisputed. The service letter statute, however, only puts a burden on the employee to show that the reasons stated were not the true cause for his leaving his employment. "[The employee's] burden is negative in character because such true reason is peculiarly within the knowledge of the employer, and the burden of showing the truth of the asserted reasons is on the employer." 489 S.W.2d at 203.

There was substantial evidence adduced from which the jury could find that plaintiff was angry over the salary discrepancy and quit his job at BH. Further, there is some question as to the veracity of the mishandling of company property charge since this "cause" was admittedly added only in response to plaintiff's potential suit over the slanderous statements made by Bjork to HFC. Finally, the jury could have decided that if "fired for stealing and mental disorders" were the reasons given to ABC, and "falsifying information" and "caught taking company property" were the reasons given to HFC, some of those reasons could be true and some could be false. The jurors were at liberty to believe the service letter's reasons were not the true reasons plaintiff left BH. *Labrier v. Anheuser Ford, Inc.,* 621 S.W.2d 51, 57 (Mo. banc 1981).

Defendant further argues that the award of punitive damages on Count I was erroneous because plaintiff failed to establish the statements were issued with "actual malice." Plaintiff submitted the punitive dam-

age issue using MAI 10.01 and 16.01. MAI 16.01 defines "malice" as "the doing of a wrongful act intentionally without just cause or excuse." This is the definition for what is commonly called "legal malice." *Labrier v. Anheuser Ford, Inc., supra,* at 58. In *Labrier,* the court restated the well-settled principle that "if the evidence sustains a showing of *either* actual or legal malice, punitive damages are recoverable." *Id.* at 58 (emphasis added). The evidence, viewed in light most favorable to plaintiff, supports a finding of legal malice. The rulings of the trial court concerning the service letter award were not erroneous.

### SLANDER

#### I.

Both of the slander actions were submitted on the theory that the publications were subject to the defense of qualified privilege. The facts surrounding this case leave some question as to whether the qualified privilege was applicable, but as the court stated in *Lazier v. Pulitzer Publishing Co.,* 467 S.W.2d 900, 904 (Mo.1971): "The parties tried this case on the theory, and seem in complete agreement on appeal, that the [defendant] had a qualified privilege, and we will take them at their word."

"The existence of a qualified privilege, however, does not preclude a party from establishing that defendants acted outside such privilege. *Estes v. Lawton-Bryne-Bruner Ins. Agency Co.,* 437 S.W.2d 685, 691 (Mo.App.1969)." *White v. American Postal Workers Union,* 579 S.W.2d 671, 673–674 (Mo.App.1979). Once the qualified privilege is injected into the proceedings, the burden is on the plaintiff to overcome the defense. This may be done, and the plaintiff may still recover, if he shows that the statement was made with *malice* by producing substantial evidence that defendant made the statements knowing they were false or without knowledge of whether they were true or false in reckless disregard for the plaintiff's rights. *Ramacciotti v. Zinn,* 550 S.W.2d 217, 225 (Mo.App.1977). Whether such malice exists is a question for

the jury. *Pulliam v. Bond,* 406 S.W.2d 635 (Mo.1966). Generally, malice may be present when the evidence shows that the defendant published the slanderous matter for a motive inconsistent with the principles that gave rise to the qualified privilege.

 Defendant asserts that the slander counts here were submitted using the wrong definition of malice to properly prescribe plaintiff's burden in a qualified privilege case. The slander counts were submitted using MAI 23.10(2), which uses the following terminology from *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which involved a "public official" plaintiff in a libel case: "knowledge that it was false or reckless disregard of whether it was false or not."

The approved instructions and several Missouri decisions provide that it is proper to use the *New York Times* definition of actual malice in *public official* cases as the plaintiff's burden in *qualified privilege* cases involving libel or slander. MAI 23.-10(1), Notes on Use No. 1; *White v. American Postal Workers Union, supra; Cash v. Empire Gas Corp.,* 547 S.W.2d 830 (Mo.App. 1976). *See also Potter v. Milbank Mfg. Co., supra.* Although the United States Supreme Court has referred to this standard as "actual malice," the drafters of the MAI declined to define the phrase, and do not even refer to the term "malice" in MAI 23.06(2) and 23.10(2), but simply recite the standard. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Essentially, what defendant asks this court to do is to say that the MAI's provisions are erroneous and should have been modified to use appellant's definition of actual malice.

Defendant contends that Missouri's definition for "actual malice" is set out in *Davenport v. Midland Building Co.,* 245 S.W.2d 460, 464 (Mo.App.1951) which reads as follows:

> Actual or express malice, exists when one with a sedate, deliberate mind and formed design injures another, as where the person is actuated by spite and ill will in what he does and says, with the design willfully or wantonly to injure another.

There is considerable confusion in the case law as to the proper terminology for the type of malice necessary to overcome the qualified privilege, as the decisions distinguish between such terms as "actual malice", "express malice", "legal malice", "constructive malice", "malice in fact" and "malice in law." *See Williams v. Kansas City Transit, Inc.,* 339 S.W.2d 792, 798 (Mo. 1960). Much of the confusion arises out of the different contexts in which these terms are used.

A considerable number of Missouri cases on "public officials" and "qualified privilege" refer to "actual malice" and define it as did the Court in the *New York Times* case. *Glover v. Herald Co.,* 549 S.W.2d 858 (Mo. banc 1977); *Whitmore v. Kansas City Star Co.,* 499 S.W.2d 45 (Mo.App.1973). *See also White v. American Postal Workers Union, supra; Estes v. Lawton-Bryne-Bruner Ins. Agency Co., supra; Smith v. J.J. Newberry Co.,* 395 S.W.2d 472 (Mo.App.1965). However, the same term is also used in cases discussing the requisite state of mind a defendant must possess before a court may award a plaintiff punitive damages. In those cases, the courts often contrast "legal malice" (a wrongful act intentionally committed without just cause or excuse) with "actual malice" (one with a sedate deliberate mind and formed design injures another). *Labrier v. Anhaeuser Ford, Inc., supra.* As noted in this opinion's previous discussion of punitive damages awarded for the service letter violation, actual and legal malice may exist independently, and either will support an award of punitive damages. It is in this second context that the *Davenport* case discusses "actual malice." However, this use is not to be interposed into the case law on qualified privilege.

The drafters of the MAI were undoubtedly aware of the vast confusion surrounding the many terms used to describe different degrees of malice, and thus the MAI used only one term "malice", and has but one definition for that term in MAI 16.01, *i.e.* "the doing of a wrongful act intentionally without just cause or excuse." MAI 23.-

10(2) does not use the *New York Times* term "actual malice", even though it uses the Court's language defining that term. Thus, any confusion arising from the use of the term in other contexts was avoided. If this court were to adopt defendant's position, that confusion would be multiplied rather than avoided. The care taken by the Supreme Court Committee on Jury Instructions is evident from the comprehensiveness of the instructions on libel and slander. For example, realizing that the *New York Times* "actual malice" would sustain an award of punitive damages, the drafters provided in the Notes on Use to MAI 23.-10(2) that MAI 4.16 should be used as a damage instruction. This instruction allows punitive damages to be awarded if the jury believes such damages "will serve to punish defendant and deter him and others from like conduct." There is no need for the jury to find "malice," either legal or actual. Again, the malice necessary to award punitive damages is *presumed* if the jury found the defendant had violated the *New York Times* test in MAI 23.10(2), and were then contemplating the proper damages.

The MAI provisions are consistent, well drafted, and in line with the federal and state law concerning both qualified privilege and punitive damages. Plaintiff correctly followed the provisions of MAI in drafting his instructions, and the standards used cannot be said to be erroneous.[1]

## II.

■■ Defendant next contends that the trial court erred in failing to sustain its motion for directed verdict and motion for judgment notwithstanding the verdict because plaintiff failed to establish, by "clear and convincing" evidence, that the statements made to Todd Siler and Karen Lomax were false, and therein make a submissible case.

Plaintiff submitted both of his slander counts using MAI 23.10(2) as a verdict director, and, as the Notes on Use to 23.10(2) provide, MAI 3.05 as a burden of proof instruction. Instruction No. 11 submitted Count III, based on the slanderous statements to Karen Lomax, and provided:

Your verdict may be for plaintiff on Count III if you believe:

First, defendant's managers, Richard Bjork and James Rund, stated plaintiff was 'stealing from the company' or was 'involved in a murder' or had 'raped their other receptionist', and

Second, such statements were false, and Third, Richard Bjork and James Rund made such statements either: with knowledge that it was false, or with reckless disregard for whether it was true or false at a time when they had serious doubt as to whether they were true, and

Fourth, such statements tended to deprive the plaintiff of the benefit of public confidence and social associations, and

Fifth, such statements were heard by Karen Lomax, and

Sixth, plaintiff's reputation was thereby damaged.

Instruction No. 14 submitted Count IV based on the slanderous statements made to Todd Siler, and provided:

Your verdict must be for plaintiff under Count IV if you believe:

First, defendant's manager, Richard Bjork, stated plaintiff 'was fired due to falsifying information to his boss and also caught taking company property' and

Such statement was false, and

Third, Richard Bjork made such statement either: with knowledge that it was false or with reckless disregard for whether it was true or false at a time when he had serious doubt as to whether it was true, and

---

1. The cases discussing the degree of malice necessary to overcome a qualified privilege often vary between the terms "express malice", "actual malice" and "malice in fact." *See, e.g. Ramacciotti v. Zinn,* 550 S.W.2d 217, 225 (Mo. App.1977). Moreover, the definitions of the above terms often turn out to be the definition of "legal malice", which is certainly not the degree of malice required to overcome a qualified privilege. *See Estes v. Lawton-Byrne-Bruner Ins. Agency Co., supra,* and *Smith v. J.J. Newberry, supra,* both quoting from *Boehm v. Western Leather Clothing Co.,* 161 S.W.2d 710 (Mo.App.1942). The MAI instructions help eliminate the confusion existent in the case law cited above.

Fourth, such statement tended to deprive the plaintiff of the benefit of public confidence and social associations, and

Fifth, such statement was heard by Todd Siler of Household Finance Corporation, and

Sixth, the plaintiff's reputation was thereby damaged.

Further, Instruction No. 17 stated that the burden of proof was on plaintiff to prove the facts alleged in the three slander counts by "clear and convincing evidence."

In deciding whether the trial court erred in failing to sustain a defendant's motion for directed verdict (and motion for judgment notwithstanding the verdict), this court must view all evidence in a light most favorable to plaintiff, giving plaintiff the benefit of all reasonable, favorable inferences to determine whether a submissible case was made. *Barnett v. M & G Gas Co.,* 611 S.W.2d 370 (Mo.App.1981). Viewed in this light, and believing only the accusations and testimony of plaintiff, Lomax and Siler, the evidence was unquestionably sufficient to support the jury's finding that defendant's agents had made the statements alleged in those instructions, made them with reckless disregard of whether they were true or false, and thereby caused plaintiff at least nominal damages for humiliation and embarrassment.[2]

### III.

■ In several of its points, defendant claims that the damages awarded were excessive. First, defendant asserts that the punitive damages awarded, $185,000 of the total award of $190,002, were the result of bias, passion and prejudice because they had "no relationship whatsoever to any injury inflicted upon plaintiff." Defendant cites to *Wisner v. S.S. Kresge Co.,* 465 S.W.2d 666 (Mo.App.1971), a false arrest case, where this court held that an appellate court would be justified in upsetting the jury's award of punitive damages if their

amount "bears no reasonable relation to the injury inflicted." *Id.* at 670. In *Wisner,* however, as with several other cases cited by defendant for this proposition, the award was affirmed as a matter peculiarly within the discretion of the jury. Here, as in *Wisner,* there was no showing of jury misconduct, improper motive, or abuse of discretion. This appellate court is not to weigh the evidence, and from the record it cannot be said the jury's awards should be disturbed.

■ In *Holcroft v. Missouri-Kansas-Texas Railroad Co.,* 607 S.W.2d 158, 163–164 (Mo.App.1980), this court clarified the role of appellate review of a jury's award of punitive damages. There, the court first restated the rule of *Schmidt v. Central Hardware Co.,* 516 S.W.2d 556 (Mo.App. 1975), that a showing of legal or actual malice, when combined with a recovery of nominal damages, will support a punitive damages award. The court went on to say:

The relation of punitive damages to the nominal or compensatory award is very tenuous. *Punitive damages, are mere incidents* to the cause of action *and are considered separate and apart from* and in addition to the assessment of *actual damages. Woods v. Standard Personal Loan Plan, Inc.,* 420 S.W.2d 380 (Mo.App. 1967); *State ex rel. St. Joseph Belt Ry. Co. v. Shain,* 341 Mo. 733, 108 S.W.2d 351 (1937), and cases cited. *There is on the other hand, a very direct relation between the amount of punitive damages and the degree of malice proved.* The very purpose of an award of punitive damages is to punish the defendant for the doing of a malicious act, and to set an example that will deter similar conduct in the future. *Id.* at 163.

In *Holcroft,* a service letter case, the court rejected the defendant's invitation to require "some showing of substantial damage or injury to the plaintiff," saying that "[f]ormulation of a rule, as proposed by

---

**2.** In *Gertz v. Robert Welch, Inc., supra,* the United States Supreme Court held "that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of falsity or reckless disregard for the truth." 418 U.S. at 349, 94 S.Ct. at 3011. Presumed damages are still awardable in the instant case under *Gertz.*

defendant, would tend to complicate and distort the present rule by an undue emphasis on injury at the expense of malice." *Id.* at 163.

The supreme court en banc has recently approved the reasoning in *Holcroft* in *Labrier v. Anheuser Ford, Inc., supra,* where the court said:

> There is no fixed relation between the amount of actual (nominal) damages and the amount of punitive damages awarded . . . . Once the trial court decides as a matter of law that the issue of punitive damages should go to the jury, then the matter is purely and peculiarly one for the jury's discretion, and is not to be reversed except on a clear showing of abuse of discretion. 621 S.W.2d at 58.

In the instant case, the jury awarded $10,000 punitive damages with the $1.00 nominal award for the service letter count; $75,000 with the $1.00 nominal award for defendant's statements to Lomax; and $100,000 with the $5,000 actual damage award for the statements to HFC.

■ The $10,000 award here was based on a finding that the service letter was issued wrongfully and intentionally without just cause or excuse ("legal malice"). That award is far less than either award in *Labrier* ($32,000 punitive, $1.00 nominal), *Holcroft* ($75,000 punitive, $1.00 nominal), or *Herberholt v. dePaul Community Health Center, supra,* ($50,000 punitive, $1.00 nominal), also cases submitted to jury on "legal malice". Surely this award was within the jury's sound discretion. *See also Alderson v. Clark Oil & Refining Corp.,* 637 S.W.2d 84 (Mo.App.1982) decided by the Western District on May 4, 1982 ($1.00 nominal, $100,000 punitive awards affirmed).

■ The punitive damage awards of $75,000 and $100,000 were based on the jury's finding that defendant had acted with either knowledge of the falsity of their statements or with reckless disregard for the truth of these statements (MAI 23.-10(2)). MAI 4.16 informed the jury simply that they should award such damages as would punish the defendant and deter he

and others from like conduct. A reading of the over 850 page transcript leaves one little doubt that the jury and the trial court could easily believe that defendant's behavior was unscrupulous and reprehensible, and that the management of BH set out to ruin both plaintiff's personal and business future. Because the award of punitive damages is so integrally related to the degree of malice present, this court cannot say that the jury abused its sound discretion in making these awards.

■ Second, defendant claims that the $5,000 award of actual damages on Count IV for the statements made to HFC cannot stand because plaintiff failed to show any actual injuries. Although plaintiff testified that he had been denied the $5,000 loan from HFC which he was going to use on his honeymoon, he subsequently borrowed the money from his mother-in-law. When asked if he'd suffered any out-of-pocket expenses, he replied that "no money came out of my pocket. I mean, I didn't lose no money over the deal." There was no evidence that plaintiff sustained any "actual injury" nor damage to his credit standing as a result of defendant's slanderous statements to Siler at HFC. *See Gertz, supra,* 94 S.Ct. at 3012. Although these damages may be allowable as "presumed" under *Gertz,* for invasion of a right, the evidence here inextricably ties them to the loan for which plaintiff was turned down with HFC. The $5,000 loan was turned down for two reasons according to Siler, those reasons being plaintiff's problems at the former job and his short time on the new job. The $5,000 actual damages awarded here is too speculative in view of the evidence. *Warner v. Southwestern Bell Telephone Co.,* 428 S.W.2d 596, 604 (Mo.1968). Thus, the $5,000 award of actual damages must be modified to provide for actual damages in the nominal amount of $1.00. *Cf. McClellan v. Highland Sales & Investment Co.,* 484 S.W.2d 239, 241 (Mo.1972).

In keeping with the principle of *Holcroft* that the actual damage award bears little or no relation to the punitive award, the $100,000 award may still stand. *See Her-*

berholt, supra (where supreme court modified actual damage conditional award to a nominal award and affirmed $50,000 punitive damages); Labrier, supra, (where supreme court reversed with instructions for trial court to set aside $10,000 actual damages and enter nominal award, but affirmed $32,000 punitive damages).

Defendant further contends that all the awards of punitive damages cannot stand because there was insufficient evidence of its financial net worth. In the case at bar, plaintiff's evidence as to net worth was that defendant was a large corporation (BH was a division of the defendant Headco Industries), was acquiring other existing businesses and rapidly expanding, and had forty-three offices in the Midwest.[3]

In determining the award of punitive damages, "the jury could properly consider such elements as the degree of malice or positive wrongdoing exhibited by the defendant, the injury inflicted upon plaintiff, the financial worth of plaintiff and defendant, and the character of the parties." Holcroft v. Missouri-Kansas-Texas Railroad Co., supra, at 164. "The financial worth of the defendant is an important factor," Wisner v. S.S. Kresge Co., supra, at 669, but it is only one of several important factors. In Holcroft, there was no direct evidence of financial worth of the defendant, but the jury was aware that defendant "was a major railroad operating in at least three states . . . ." There, the court affirmed an award of $75,000 punitive damages, saying: "the jury could reasonably conclude that a smaller award of punitive damages would have little deterrent effect."

■ In the instant case, the evidence of financial worth was at least as detailed as that in Holcroft, but the degree of malice submitted to the jury in the slander counts was greater than that submitted in any of the cases discussed thus far. Moreover, the trial court had an opportunity to reduce the judgment if it thought the award would overly burden defendant when it ruled on defendant's motion for new trial, but declined to do so. As the court stated in Potter v. Milbank Mfg. Co., supra:

> Of course the trial court had the discretion to reduce the judgment, and this court is authorized to review the trial court's ruling to determine whether such was an abuse of discretion. An award of punitive damages need not be reduced solely because no other award has reached the same figure; something else should be demonstrated as a basis for finding an abuse of discretion in failure to require remittitur, because the matter of punitive damages 'is so purely and peculiarly one for the jury's discretion that regardless of what the character of the action may be * * *, it is only in an extreme case that an appellate court will undertake to revise such an award.' La Chance v. National Pigments & Chemical Co., Mo.App., 104 S.W.2d 693, 701[19].

This is not the "extreme case" where this court should undertake to revise the lower court's awards, as the many factors involved here make it clear that those punitive damage awards did not constitute an abuse of discretion. Punitive damage awards are peculiarly a jury function, and absent an abuse of discretion, an appellate court will not interfere with the assessment. Holcroft, supra, at 163.

## IV.

■ Defendant also asserts that the trial court abused its discretion in refusing to allow the jury to view certain color photographs which showed plaintiff posing in the nude. These photographs were taken by the former receptionist at BH, (the one presumably referred to as having been raped by plaintiff in the Lomax conversation) and defendant maintains that they are relevant and material to plaintiff's character and reputation, which defendant claims were put directly in issue by virtue of the alleged libel and slander. Defendant also

---

**3.** The record shows that although defendant's counsel said that he had supplied plaintiff's counsel with evidence of the corporation's net worth, plaintiff's counsel had not received this information at trial. The evidence as to net worth cited above came from plaintiff's cross-examination of defendant's vice-president Highley regarding net worth.

contends that because plaintiff denied ever posing for these photographs, they had a direct bearing on his credibility. The trial court admitted these photographs into evidence because of plaintiff's denial that they had been made. The former receptionist testified as to what the photographs depicted and the circumstances surrounding their preparation. However, when defendant requested they be viewed by the jury, plaintiff objected, whereupon the trial court stated: "in the exercise of my discretion, it will not serve any useful purpose in this trial," to which defendant's counsel responded, "okay."

The trial court is vested with broad discretion in ruling on the admission (or as here, the viewing) of photographic evidence, and in order to be presented into evidence, the photograph must be practical, instructive and calculated to assist the jury in understanding the case. *Long v. Hooker,* 443 S.W.2d 178 (Mo.1969); *Gignoux v. St. Louis Public Service Co.,* 180 S.W.2d 784 (Mo.App.1944).

In the present case, it is clear that the trial court attempted to ensure that the jury knew of the existence and character of the photographs, but wished to avoid the prejudice that would result if the jury viewed the photograph's highly inflammatory contents. *See Faught v. Washam,* 329 S.W.2d 588, 600 (Mo.1959). The trial court acted properly and its rulings here did not result in prejudicial error.

### V.

■■■ Defendant next contends that the trial court erred in admitting into evidence plaintiff's application for employment with ABC, as it was not properly qualified under the Uniform Business Records as Evidence Act, § 490.680, RSMo 1978. Defendant also alleges that the branch manager, appearing with these records of ABC pertaining to plaintiff, was not the proper custodian to identify the records. The trial court is afforded large discretion in determining if a party has properly complied with § 490.680. *Ralston Purina Co. v. Ryder,* 573 S.W.2d 128, 129 (Mo.App.1978).

Plaintiff was hired by ABC on November 12, 1978, and as stated previously, was terminated on December 4, 1978, for falsifying his age on his application for employment. The branch manager identified the application as being kept in the usual and ordinary course of business, that he was in charge of the records, and that the entries made were made at or near the time of the events recorded. He assumed ABC's president had made the scribbled notations on the application which declared that plaintiff was "suing BH" and had been "fired for stealing and mental disorders," after he had spoken to someone at BH. Defendant claims that the admission of this evidence was highly prejudicial because it made it seem as though the company was still slandering plaintiff over a year and one half after he left BH.

Defendant's claim of error overlooks the fact that it allowed the witness to recite scribbled comments on the application to the jury without objection, and did not object until plaintiff attempted to have the application itself admitted into evidence. The trial court then stated: "I am going to sustain the objection as to those parts of the record that are not under his personal control. I am going to overrule the motion regarding striking the testimony from the record as being waived when not made when the testimony was given." The jury had the matter before them whether the exhibit was received into evidence or not, so even if the witness was not properly qualified as the custodian, any error was therefore harmless. *Boten v. Brecklein,* 452 S.W.2d 86, 96 (Mo.1970). The trial court ruled correctly, and defendant cannot claim as error that which he waived as error in the trial court. *See Walkley v. Sears, Roebuck & Co.,* 536 S.W.2d 169, 171 (Mo.App. 1976); *Wilkins v. Cash Register Service Co.,* 518 S.W.2d 736, 748 (Mo.App.1975).

### VI.

■■■ Defendant claims that the burden of proof instructions submitted here were "misleading, improper and prejudicial in their phraseology" in that the service

letter count's preponderance of the evidence standard was improperly broad and included the propositions submitted in the slander counts. The burden of proof standards were properly submitted using MAI 3.01 and MAI 3.05. The ultimate test for determining the validity of an instruction centers on whether the average juror will correctly understand therefrom the applicable rules of law. *Beck v. Modern American Life Ins. Co.,* 589 S.W.2d 98, 103 (Mo.App.1979). When specific Missouri Approved Instructions are applicable such instructions must be given. *Weltscheff v. Medical Center of Independence, Inc.,* 604 S.W.2d 796 (Mo. App.1980).

In the present case, it is inconceivable that jurors of average abilities and intelligence could have been misled by the language in the patterned instructions. *See Deskin v. Brewer,* 590 S.W.2d 392, 400–401 (Mo.App.1979). In each burden of proof instruction, there was specific reference to the counts included under that instruction, and no modification was necessary to make the instructions more clear. No prejudicial error resulted from the burden of proof instructions tendered here.

### VII.

■ Defendant also claims that the statements from Bjork and Rund to Lomax did not constitute an actionable publication because they were communications between individuals within the same company. Defendant failed to preserve this point in any post-trial motion and, therefore, failed to preserve the argument for appellate review. Rule 84.13(a). In any case, defendant's reliance on *Hellesen v. Knaus Truck Lines,* 370 S.W.2d 341 (Mo.1963), for the proposition that "communications between officers of the same corporation in the due and regular course of corporate business, . . . are not publications to third persons . . ." is misplaced. *Id.* at 344. In *Hellesen,* the communication was the corporate defendant's placement of a memorandum on its files which lead the court to rule that it was merely the corporation "communicating with itself." Here, Karen Lomax was not an officer of BH, nor was the communication "within the due and regular course of corporate business," and cannot be considered as the corporation communicating with itself. *See Rammacotti v. Zinn, supra.* Defendant's point is denied.

### VIII.

■ Defendant seeks sanctuary for its statements to Lomax and Siler relying on *Cash v. Empire Gas Corporation,* 547 S.W.2d 830 (Mo.App.1977), for the proposition that they were made under qualified privilege and under a "duty" to impart this information to them. This argument will not stand. In *Cash,* the statements were made by a former employer to a prospective employer. The facts underlying the court's opinion in *Cash* bear no similarity to the defendant's statements made here to a present employee (Lomax) and to a caller (Siler) verifying information in a loan application. To ascribe a "duty" by defendant to proffer these statements is utterly without merit.

Suffice it to say that the information passed on by defendant was unsolicited by Lomax or Siler, and neither of those persons had a "definite interest" in the unsubstantiated statements as envisioned in *Cash.* Defendant cannot show that it either acted in good faith or reasonably believed the statements it made were true.

### IX.

■ Finally, defendant contends that Instruction No. 6, defining malice (MAI 16.-01), was misleading because it defined malicious as used in "these instructions," when the term "malice" was used only once, in the service letter punitive damage instruction. Defendant claims this prejudiced him because it implied that definition "to other acts of defendant set out in subsequent instructions . . . in which 'actual malice' was required." Defendant also argues that the definition instruction should have been added to the damage instruction using the term malicious, rather than in a separate instruction.

Because the term "malicious" was only used in the service letter punitive damage instruction, and no mention of the term "malicious" can be found in the slander counts' verdict directors, it is hardly possible that the jury would interpolate the definition in MAI 16.01 into the *New York Times* definition of actual malice in those subsequent verdict directors. Absolute perfection is not the test for use of the approved instructions, and a slight deviation is not enough to create prejudicial error; the test is whether the instruction is substantially correct. *Hawkins v. Great Central Insurance Co.,* 509 S.W.2d 477, 478 (Mo.App. 1974); *McCory v. Knowles,* 478 S.W.2d 682, 686 (Mo.App.1972).

The use of "these" instead of "this" in MAI 16.01 cannot be deemed prejudicial error in this case, where there was little chance the deviation was misleading or prejudicial, and the use of the patterned instruction was substantially correct. Further, Notes On Use No. 1 to MAI 16.01 states that "[w]here the term [malice] is used in only one instruction, this definition *may* be added to the instruction using the term." (Emphasis added.) This makes separating the definition instruction optional, not mandatory.

For the foregoing reasons, defendant's other points, being no more than a repetition or cumulation of those previously addressed, are hereby denied.

Judgments are affirmed as to all awards of punitive damages and as to the awards of nominal damages on Counts I and III. The award of $5,000 actual damages on Count IV is reversed and remanded to the trial court to enter judgment for actual damages in the nominal amount of $1.00.